

FILED

JAN 0 9 2009

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____CP_____ DEPUTY

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD GONZALEZ SAMAYOA,<br><br>                              Petitioner,<br><br>                    vs.<br><br>ROBERT L. AYERS, JR., Warden of the<br>California State Prison at San Quentin,<br><br>                              Respondent. | Civil No.      00cv2118-W (AJB)<br><br>**DEATH PENALTY CASE**<br><br>**ORDER DENYING PETITIONER'S<br>MOTION FOR EVIDENTIARY<br>HEARING [Doc. No. 77]; DENYING<br>PETITIONER'S MOTION FOR<br>SUMMARY JUDGMENT [Doc. No.<br>78]; DENYING THE PETITION** |

        Petitioner Richard Gonzalez Samayoa has moved for an evidentiary hearing and/or summary judgment on several of the claims in his Amended Consolidated Petition for Writ of Habeas Corpus; Respondent Robert L. Ayers, Jr. opposes both motions.

        Oral arguments were held before U.S. District Judge Thomas J. Whelan on December 11, 2008. Appointed counsel Glen Niemy appeared on behalf of Petitioner, and Deputy Attorney General Marilyn L. George of the California Attorney General's Office appeared on behalf of Respondent. Upon consideration, the Court **DENIES** Petitioner's motion for evidentiary hearing on Claims 1 and 4-10, **DENIES** Petitioner's motion for summary judgment on Claims 1 and 6 and **DENIES** habeas relief as to all claims.

///

# I. PROCEDURAL HISTORY

By an amended complaint filed February 21, 1986, Petitioner Richard Gonzales Samayoa was charged with the special circumstance murders of Nelia and Katherine Silva on December 18, 1985.  He was also charged with the crime of burglary with a dangerous weapon.  An Information alleging these same offenses was filed on January 7, 1987, and an identical Amended Information was filed on April 18, 1988.

Petitioner was convicted on April 21, 1988, of two counts of first-degree murder in violation of California Penal Code § 187 and one count of burglary in violation of Cal. Penal Code § 459--each count with findings that Petitioner used a deadly weapon in the commission of the crimes in violation of Cal Penal Code § 12022(b).  Petitioner was also found guilty of the two special circumstance allegations; multiple murder under Cal. Penal Code § 190.2(a)(3), and murder in the attempted commission of a burglary under Cal. Penal Code § 190.2(a)(17)(vii).  The jury returned a verdict of death for the murders on May 4, 1988, and the court entered judgment in accordance with the verdict on June 28, 1988, issuing a stay of the sentence on the non-capital count and the enhancements pending appeal.

Petitioner filed his opening brief on automatic appeal to the California Supreme Court on July 19, 1995, raising twenty (20) separate issues including, but not limited to, claims of an insufficient appellate record, errors in jury selection, denial of access to personnel files of prosecution witnesses, jury instruction errors, violations of the Confrontation Clause, prosecutorial misconduct, and constitutional challenges to the death penalty statute.  The California Supreme Court denied the appeal on June 19, 1997.  People v. Samayoa, 15 Cal. 4th 795 (1997).  On August 13, 1997, the state court denied the petition for rehearing.  Petitioner filed a Writ of Certiorari with the United States Supreme Court, which was denied on February 23, 1998.

On February 3, 1997, Petitioner filed a habeas petition with the California Supreme Court, raising thirteen (13) grounds for relief including, but not limited to, claims of Petitioner's incompetency, police coercion in obtaining the confession, trial court errors, ineffective assistance of counsel during both the guilt and penalty phases, Brady error, denial of psychiatric

-2-

00cv2118

1  assistance, prosecutorial misconduct, and constitutional challenges to the death penalty statute.
2  Petitioner was not granted an evidentiary hearing on these claims and his petition was summarily
3  denied on the merits on September 27, 2000.

4       On October 16, 2000, Petitioner filed a request for appointment of counsel to handle his
5  federal habeas petition. Counsel was appointed on March 5, 2001, and Petitioner filed an initial
6  Petition in this court on January 28, 2002. After several claims were found to be unexhausted,
7  Petitioner filed a second state habeas petition in the California Supreme Court on November 4,
8  2003. The state court denied the petition on March 16, 2005. On September 14, 2005, the
9  court granted Petitioner leave to amend the current petition by adding two claims. Petitioner
10  filed an Amended Consolidated Petition in this court on October 13, 2005. Respondent filed
11  an Answer on June 12, 2006. Petitioner filed a Traverse on November 22, 2006.

12       On January 9, 2007, the Court ordered additional briefing on the potential need for an
13  evidentiary hearing, and whether Petitioner requested summary judgment on any claims. On
14  April 6, 2007, Petitioner filed a Motion for Evidentiary Hearing, and on April 9, 2007, Petitioner
15  filed a Motion for Partial Summary Adjudication. On August 7, 2007, Respondent filed an
16  Opposition to Petitioner's Motions, and on October 17, 2007, Petitioner filed Reply briefs.

17

18                  **II. TRIAL PROCEEDINGS**

19  **1.**    **The Guilt Phase**

20       A.    Prosecution Case In Chief

21       The prosecution established that Nelia Silva picked up her daughter Katherine from the
22  babysitter's home across the street from her home at approximately 6 p.m. on December 18,
23  1985. (RT 3058-63.) Victoria Cruz, who was visiting a friend in the neighborhood that night,
24  testified that she heard an "awful yell" and screaming that was like an "animal sound" without
25  any words, and then saw smoke coming from the Silva home. (RT 3066-73.) Ms. Cruz and
26  another person went into the home to investigate, where they saw a child with blood near her
27  head and a half dressed lady down the hall and they ran out of the home to call police. (RT
28  3073-76.)

1    Rolando Silva, the husband and father of the victims, found them when he arrived home
2    from work and went to get help.  (RT 3322-34.)  Mr. Silva testified that multiple pieces of
3    jewelry were missing from the house and identified the pieces found in his yard by the police, as
4    well as the jewelry turned over to police by members of the Samayoa family, as belonging to him
5    or his wife.  (RT 3334-45.)

6    Howard Labore of the San Diego Police Department was the first officer on the scene, and
7    testified there was smoke coming from the home, which he entered.  (RT 3076-81.)  Labore
8    found both victims, and stated they were both obviously dead, with the woman's head "caved
9    in."  (RT 3081-84.)  San Diego firefighter Joseph Taormina was called to describe the condition
10   of Nelia Silva's body, and firefighter Lorraine Harris described the condition of Katherine Silva's
11   body.  (RT 3092- 3106.)

12   Several of Petitioner's family members were called to testify about jewelry Petitioner gave
13   them shortly after the murders.  Mercedes Samayoa, Petitioner's mother, identified the jewelry
14   which Petitioner had in his possession after Christmas time.  (RT 3108-3112.)  Mrs. Samayoa
15   stated she heard the police ask about jewelry, so the family turned the items over to police, in
16   addition to turning over a jewelry box.  (RT 3112-17.)  Deana Samayoa, Petitioner's sister,
17   testified about jewelry her brother gave her after the murders, which Petitioner told her he had
18   made.  (RT 3122-28.)  Inez Sykes, another sister of Petitioner, found jewelry in her bathroom just
19   before Christmas, which Petitioner said belonged to him, and which she also turned over to the
20   police.  (RT 3128-37.)

21   Raul Samayoa, Petitioner's brother, testified that he was working with Petitioner in the
22   garage the day of the murders, and identified a wrench which looked like one belonging to him
23   which had been found in the victim's yard.  (RT 3139-46.)  He also testified that he found a
24   jewelry box in the family yard after police told them about it, which was turned over.  (RT 4142-
25   46.)  Oscar Samayoa, one of Petitioner's brothers, testified that after the murders Petitioner gave
26   him a ring to give to a girl, and he found a necklace in Petitioner's room.  (RT 3156-64.)
27   Samayoa also testified that he once helped the victim, Nelia Silva, install a stereo in her home,
28   but that was the only time he was ever inside her house.  (Id.)

-4-

1    San Diego Police Department evidence technician Larry Fregia testified that he took

2   photos of the scene and collected evidence the evening of the murder, including the wrench,

3   earring back, earrings, military service ribbon, and other items that were seized and processed.

4   (RT 3166-3214.) Fregia testified that these items were tested for fingerprints, but none were

5   recovered.  (RT 3214-19.)  Fregia found some latent prints on the walls of the home, which he

6   sent for processing, and also got fingernail scrapings from Nelia Silva.  (RT 3219-3224.)  He

7   collected the fingerprints and fingernail scrapings of Nelia Silva and her husband, but did not

8   fingerprint Katherine Silva.  (RT 3224-27.)

9    A forensic pathologist, Dr. Robert Bucklin, performed the autopsies on both victims.  (RT

10   3227-34.)  He testified that Nelia had suffered crushing blows to her head and jaw, suffered 15

11   lacerations to her face alone and 24 total to her head, including skull fractures, and opined that

12   death would not have been immediate, but would have occurred within a few minutes of the

13   injuries to the skull.  (RT 3234-54.)  He testified that Katherine Silva suffered three blows, with

14   one blow being severe enough to have fractured her skull base, opining that she would have been

15   unconscious and also would have died within a few minutes of sustaining the injuries.  (RT 3254-

16   61.)  Dr. Bucklin stated it was hard to separate the wounds of each victim as there was overlap;

17   he also found several wounds to the victim's hands, but could not conclusively determine if the

18   wounds were defensive, and stated that no sperm was found in Nelia Silva.  (RT 3261-70.)

19    Criminalist Larry Dale performed the blood spatter work by examining the scene after the

20   bodies were removed and taking samples.  (RT 3275-91.)  He testified that the concentration

21   of blood was more low than high on the walls, and opined there could be two sources of blood,

22   one from the victim and one from the weapon swinging.  (RT 3291-3314.)

23    Detective Richard Allen Carey assisted in the gathering of evidence at the scene, and

24   helped recover the wrench and jewelry in the corner of the yard.  (RT 3346-56.)  Carey testified

25   there were fresh pry marks on the metal door, blood in the hallway, the office, the child's

26   bedroom, and on the walls of the home.  (RT 3356-72.)  Carey added there was blood in the

27   bedrooms, on the ceiling above both victims, and he also assisted in the collection of blood

28   samples from both victims, and a hair sample from Nelia Silva.  (RT 3373-87.)  Officer Art

1    Beaudry collected property from the Samayoa residence weeks after the murders, which included

2    the jewelry the family turned over and a jewelry box.  (RT 3423-27.)

3         Edward Lee Danner, an investigator for the District Attorney's office, testified that he

4    gave Petitioner a <u>Miranda</u> warning before the police psychiatrists spoke to him.  (RT 3431-37.)

5    Dr. Walt Griswold, a police psychiatrist, testified that he conducted an interview of Petitioner

6    at the jail and tape recorded the interview.  (RT 3437-44.)   Dr. Griswold recalled Petitioner

7    saying he felt "panicky" but Dr. Griswold did not remember Petitioner ever saying that once he

8    became angry, it was hard for him to calm down.  (RT 3444-45.)

9         Latent print examiner Ralph Bukowski testified there were two usable prints from the

10   scene, one fingerprint, which did not match either victim or Petitioner, and one palm print,

11   which did not match either victim.  (RT 3447-57.)  Petitioner's palm print was not collected, and

12   his fingerprints were not matched to any latent prints recovered from the scene.  (RT 3457- 59.)

13        Serologist Walter Fung testified that both victims and Petitioner had type A blood, which

14   he unsuccessfully tried to distinguish using protein tests.  Fung testified that Type A blood was

15   found all over the scene and there was no reason to believe it was Petitioner's; it was most likely

16   all from the two victims.  (RT 3459-80.)  Fung added that he was also unable to distinguish the

17   blood of the two victims from one another, and ultimately did not find any blood evidence

18   linking Petitioner to the scene.  (RT 3480-81.)

19        Officer Patrick Padillo, a homicide detective assigned to the case, conducted an interview

20   of Petitioner in jail on January 31, 1986.  He stated that Detective Jordan, who conducted the

21   interview while Padillo took notes, advised Petitioner of his <u>Miranda</u> rights, after which

22   Petitioner said he was willing to talk.  (RT 3483-89.)  Padillo described Detective Jordan's bluff

23   in telling Petitioner that they possessed hair evidence that linked him to the scene, and showing

24   him photos of the wrench and jewelry.  (RT 3489-92.)  Padillo testified that after Detective

25   Jordan said "She was a fighter, wasn't she?" that Petitioner put his head down, nodded, and told

26   them he went there to steal money and jewelry and only hit her and the baby to get away.  (RT

27   3492-95.)  Petitioner went on to claim that he pulled Nelia Silva's pants down to make it look

28   like a rape and robbery, but it was not, that he did not drink or do drugs that day, and that he

-6-                                00cv2118

1    later hid the jewelry he stole. (RT 3495-3500.) Petitioner maintained that he gave some of the

2    jewelry to family members, and told the officers he did not mean to hit the baby. (RT 3500-06.)

3    A few days later, the detectives returned for another interview, and hid a recorder in a coat; this

4    tape was played for the jury. (RT 3506-16.)  Padillo stated the second interview was more like

5    a conversation, which was in contrast to the first interview, and during this interview Petitioner

6    said he felt bad about the crimes. (RT 3516-28.)

7         Wayne Burgess, the Chief of Investigations for the District Attorney's office, concluded

8    the state's case by testifying on crime scene analysis. (RT 3535-42.) Burgess testified that the

9    blows to both victims were consistent with a wrench used as a weapon, and opined the blood on

10   Nelia Silva's body indicated her panties were off before blood was on the body. (RT 3544-46.)

11   Burgess added that many of the blows to Mrs. Silva came when she was lying on the ground, and

12   concluded that she was moved to the position in which she was discovered. (RT 3546-49.)

13        B.    Defense Case

14        Defense conceded Petitioner's guilt on two counts of first degree murder and one count

15   of burglary, contending that they would present evidence of Petitioner's brain damage that would

16   negate an intent to kill, and thereby prove his innocence of the special circumstance allegation

17   of murder in the course of a burglary. (RT 3046-49.)

18        Dr. Meredith Friedman, a psychologist, gave a battery of tests to Petitioner in order to

19   determine if he suffered from brain damage. (RT 3639-47.)  Dr. Friedman also took a patient

20   history in order to attempt to determine the potential cause of any brain damage found by the

21   tests; the patient history detailed numerous head injury incidents in Petitioner's youth.  (RT

22   3647-48.) Dr. Friedman testified that Petitioner's results showed Petitioner had difficulties in

23   the testing that were associated with problems in left parietal-occipital areas of the brain, which

24   to her indicated temporal lobe and frontal lobe damage. (RT 3648-52.) Dr. Friedman explained

25   the temporal lobe coordinated emotion, aggression, rage reactions, and that people who suffered

26   damage to those areas of the brain have emotionally reactive personalities and a tendency to

27   panic and overreact. (RT 3652-58.) Dr. Friedman opined that Petitioner suffered from schizo-

28   type underlying personality disorder, and also suspected antisocial personality disorder, that

1  Petitioner is a sociopath. (RT 3669-82.) Dr. Friedman conceded that the results of several

2  facets of the test administered to Petitioner fell within the normal range of results. (RT 3693-

3  3726.) Dr. Friedman admitted that she made some errors in calculating the test results but

4  asserted that they did not change her final opinion. (RT 3735-41.) Dr. Friedman also

5  acknowledged she is not a neuropsychologist, and did not conduct a test to make a final

6  determination on the existence of brain damage, maintaining that the tests she performed only

7  point to the possibility of brain damage. (RT 3816-26.)

8       Both parties then stipulated to the testimony of John Durina, a hair examiner for the

9  police department, who did not recover any hairs from the scene or the victims' bodies belonging

10  to Petitioner. (RT 3841-45.)

11      Dr. Saul Saddick, a neuropsychologist, then took the stand to testify that a head injury

12  does not automatically mean there is brain damage, as it depends on the severity and type of

13  injury. (RT 3845-95.) However, Dr. Saddick found in this case mild to moderate cerebral

14  damage in Petitioner's left frontal lobe, parietal and temporal, which was significant and without

15  such damage, Petitioner would be less likely to have a short fuse, and would have a lessened

16  tendency for aggression. (RT 3895-3908.) Dr. Saddick went on to describe Petitioner's results,

17  including the existence of lesions on the parietal lobe, contributing to a viscosity or stickiness to

18  his behavior, as well as his rage reaction, which consisted of a response out of proportion to a

19  triggering action, and including a hard time stopping once he starts an action. (RT 3908-44.)

20  Dr. Saddick's diagnosis was that Petitioner suffers from organic personality syndrome, explosive

21  type, as well as antisocial personality disorder, and mild to moderate left hemisphere cerebral

22  cortical damage/dysfunction with primary left frontal parietal involvement. (RT 3944-45.) The

23  prosecutor cross-examined Dr. Saddick with the results of other testing which did not support

24  a finding of brain damage. (RT 4039-56.) Dr. Saddick acknowledged that he found Petitioner

25  to be a sociopath, which is one of the worst personality disorders to have and one of the least

26  amenable to treatment. (RT 4056-4064.) Dr. Saddick conceded that Petitioner reported

27  laughing when people get killed on television. (RT 4118.)

28      The parties also entered into a stipulation regarding Dr. Dixon, stating she would have

1    testified that Petitioner often perseverates, which points to organicity, and the origin of this

2    behavior could be due to alcohol or drugs. (RT 4175-76.)

3        C.    <u>Prosecution Rebuttal</u>

4        Dr. Nelson Butters, a psychologist with a specialty in neuropsychology, critiqued Dr.

5    Saddick's testimony by stating that his diagram of Petitioner's brain was mislabeled and upside

6    down, opined that an expert cannot base a diagnosis of brain damage on only one test, and stated

7    that Dr. Saddick's conclusions regarding Petitioner were incorrect. (RT 4176-96.) Dr. Butters

8    further stated that Dr. Saddick's methodology and test choices were flawed, and he saw no

9    evidence of organic rage disorder, and did not see how any neuropsychologist could come to such

10   a conclusion. (RT 4196-4228.) Dr. Butters also stated that if there had been a rage reaction,

11   Petitioner would have memory problems regarding the crime in question, and the taped

12   statements in this case belied that conclusion. (RT 4290-92.)

13       Dr. Jeste, a professor of psychiatry and neurosciences, testified that "organic rage reaction"

14   is not recognized by the American Psychiatric Association, but stated that other similar disorders

15   were possible. (RT 4299-4304.) Dr. Jeste ruled out organic personality syndrome, intermittent

16   explosive disorder, and found no evidence of a seizure disorder. (RT 4299-4306.) Dr. Jeste

17   concluded that he was unable to determine if Petitioner suffered from a rage reaction, as there

18   was no measure of his brain performance at the time of the homicides. (RT 4307-16.)

19       D.    <u>Defense Surrebuttal</u>

20       Dr. Melvin Schwartz, a clinical psychologist, neuropsychologist and forensic pathologist,

21   examined all the materials considered by the other experts. (RT 4330-34.) Dr. Schwartz opined

22   that he agreed with Dr. Saddick's conclusion that Petitioner suffers from brain damage to the left

23   hemisphere, and explained that brain damage does not always result in memory problems, adding

24   that any impairment in the brain could result in uncontrollable rage. (RT 4337- 45.) Dr.

25   Schwartz added that brain damage may not show up on tests such as a CAT scan or EEG. (RT

26   4345-50.) Dr. Schwartz stated that he could not make any precise localization of the damage,

27   or estimate of the amount of damage suffered using these test results as he had not examined

28   Petitioner and his conclusions came solely from looking at test results. (RT 4358-63.) Dr.

1    Schwartz conceded he previously found Dr. Saddick overdiagnosed brain disease in one or two

2    past cases, but did not think that was true in Petitioner's case. (RT 4369-74.) He also admitted

3    that he had previously found scoring errors in tests performed by Dr. Saddick, but not in the tests

4    administered in this case. (RT 5385-92.)

5    **2.     Penalty Phase**

6           A.     Prosecution Case

7           The prosecution's case centered on evidence of Petitioner's prior convictions, starting

8    with his prosecution for the burglary and rape of Berta Lou Raymond in 1976. Robert Williams

9    first testified that he examined Mrs. Raymond in 1975 as a victim of sexual assault, and no

10   semen was found. (RT 4709-15.) Annegret McLaughlin, a neighbor of Mrs. Raymond, heard

11   a call for help and responded, whereupon Raymond told her, "he had a knife and he raped me."

12   (RT 4715-23.)

13          The 1976 preliminary hearing testimony of Berta Lou Raymond was read into the record,

14   as Raymond was deceased at the time of the instant trial. Mrs. Raymond stated that she suffered

15   from multiple sclerosis, and that night she was asleep in bed at 2:15 a.m. (RT 4725-28.) She

16   stated that three men broke into her home, and one of the men raped her anally and vaginally

17   even after she told the man she was an invalid. (RT 4730-35.) She testified that the men also

18   stole items from her home. (RT 4735-37.) She also admitted that she was unable to identify her

19   assailant, but was able to provide a general description of her assailant. (RT 4737-40.)

20   Petitioner was convicted of burglary and rape.

21          David Anderson testified that he accompanied Petitioner in robbing Mrs. Raymond in

22   1975 with a third man. (RT 4743-47.) Anderson admitted he took the stereo, and upon

23   entering the bedroom, he was shocked Petitioner was raping the victim. (RT 4747-51.) He

24   stated that earlier that evening, Petitioner had commented that if the victim was home, he

25   planned to rape her, and stated "he was going to knock off a piece." (RT 4751-54.) Anderson

26   then admitted, for the first time, that both he and Petitioner had sex with Mrs. Raymond. (RT

27   4754-56.) Anderson acknowledged that he had previously blamed everything on Petitioner in

28   his interviews with Detective Jordan. (RT 4757-62.)

1    The prosecution then presented evidence of Petitioner's 1981 conviction for assault with

2   a deadly weapon.  Rosendo Ramirez testified that he knew and was friends with Petitioner in

3   1981, with Petitioner staying over in his room one evening.  (RT 4774-80.)  Later that evening,

4   Ramirez's sister woke him, she was bleeding and shaking and said Petitioner had hit her.  (RT

5   4780-84.)  Ramirez later confronted Petitioner and threatened him as a result of this incident.

6   (RT 4784-86.)  Elvira Ramirez Zavala testified that she awoke one evening to glass breaking,

7   someone said her name and threatened her, stating that he wanted sex.  (RT 4790-97.)  The

8   man punched her, and Zavala saw it was Petitioner; when he asked for sex she refused.  (RT

9   4797-98.)  Zavala said Petitioner threatened her, but she was able to leave the room and wake

10   her brother to call the police.  (RT 4798-4805.)  Zavala conceded that Petitioner did not stop

11   her from going to her brother, but asserted that Petitioner said if she told anyone what had

12   occurred, he would kill her.  (RT 4805-14.)  Officer David Russell was called to the scene,

13   stating the victim had sustained  injuries and there was a broken pot by her bed.  (RT 4816-20.)

14   Officer Gonzales went to the Petitioner's home in response to the assault call, and stated that

15   Petitioner waived his Miranda rights.  (RT 4821-24.)  Gonzales testified that Petitioner claimed

16   he walked home when Ramirez became ill, before the alleged assault, and denied there was blood

17   on his shirt, but blood was later recovered from Petitioner's shirt.  (RT 4824-26.)

18    The prosecution also introduced evidence of Petitioner's 1974 burglary conviction.  (RT

19   4826.)

20    B.    Defense Case

21    Department of Corrections counselor Paul Dillard testified that he supervised Petitioner

22   in the kitchen in 1981 and found him to be a reliable and dependable worker.  (RT 4836-46.)

23   Counselor Ronald Baldwin testified that he supervised Petitioner on a inmate landscaping crew

24   in 1983 and found him to be a good worker.  (RT 4857-60.)  Soledad correctional officer Robert

25   Smith testified that Petitioner was on his work crew and was a good worker.  (RT 4867-71.)

26    Petitioner's mother Mercedes Samayoa then testified that she loved her son and did not

27   want him to get the death penalty, and identified cards and pictures she had received from him

28   over the years. (RT 4889-94.)  Petitioner's sister Inez Sykes testified that she loved Petitioner and

-11-                                           00cv2118

1  wanted him to receive a sentence of life in prison.  (RT 4909-16.)  Petitioner's sister Deana

2  Samayoa stated that, in testifying for the prosecution, she did not want to help send her brother

3  to death row, and noted Petitioner had a daughter that he loved.  (RT 4918-24.)

4

5  ### III.  LIST OF FEDERAL HABEAS CLAIMS

6  1.  Ineffective Assistance of Trial Counsel at the Guilt and Penalty Phases

7  2.  Trial Court's Improper Dismissal of Jurors Who Did Not Favor Capital Punishment

8  3.  Introduction of Raymond Testimony During Penalty Phase

9  4.  Exculpatory Evidence on Credibility of Government Witness

10  5.  Trial Court's Refusal to Permit Cross-Examination and Denial of Pitchess Motion

11  6.  Illegal Seizure Resulting in Petitioner's Confession

12  7.  Violation of Petitioner's Right to Testify at Trial

13  8.  Ineffective Assistance of Counsel for Failure to Investigate Forensic Evidence

14  9.  Coercion in Obtaining Petitioner's Confession to Dr. Griswold

15  10.  Petitioner's Incompetence to Stand Trial

16

17  ### IV.  PROCEDURAL DEFAULT

18  Respondent first asserts that claims 2, 6, 7, 9, and 10 are procedurally defaulted.  When

19  a state court rejects a federal claim due to a violation of a state procedural rule that is adequate

20  to support the judgment and independent of federal law, a habeas petitioner has procedurally

21  defaulted his claim.  Coleman v. Thompson, 501 U.S. 722, 729-30 (1991).  A state procedural

22  rule is adequate if it has been "firmly established and regularly followed" by the state court.  Ford

23  v. Georgia, 498 U.S. 411, 424 (1991).  The procedural rule is independent if it is not "interwoven

24  with the federal law."  Michigan v. Long, 463 U.S. 1032, 1040-41 (1983).  If a state procedural

25  ground is an adequate and independent ground for dismissal, habeas corpus relief is unavailable

26  in federal court unless a petitioner can show cause for the default and resulting prejudice, or

27  show that a failure to consider the claims would result in a fundamental miscarriage of justice.

28  See Coleman, 501 U.S. at 750.

1    In the instant case, Petitioner filed his automatic appeal on July 19, 1995, and his first

2  state habeas petition on February 3, 1997. In a September 2000 order denying that petition, the

3  California Supreme Court denied claim 2 on the merits and "under *Waltreus, supra*, 62 Cal.2d

4  218, 225." (Doc. No. 69; Lodgment 4.) In the same order, the state supreme court denied claim

5  9 of the instant petition on the merits and under procedural grounds, citing to In re Waltreus,

6  62 Cal.2d 218, 225 (1965) and In re Dixon, 41 Cal.2d 756, 759 (1953).

7    Petitioner raised additional claims and re-raised prior claims in a second state petition

8  filed on November 4, 2003. In a March 2005 order denying the petition, the California Supreme

9  Court denied claim 6 with citations to In re Seaton, 34 Cal.4th 193, 200 (2004), In re Harris, 5

10  Cal.4th 813, 830 (1993), In re Robbins, 18 Cal. 4th 770, 780-81 (1998) and In re Clark, 5 Cal.

11  4th 750, 767-68 (1993). The state court denied claims 7 and 9 on the merits and barred them

12  under both Clark and Robbins, further denying claim 9 with citations to Waltreus, In re Miller,

13  17 Cal.2d 734, 735 (1941) and Dixon. The state court also denied claim 10 of the instant

14  petition on the merits and with citations to both Robbins and Clark.

15  **1.   Waltreus**

16    The California Supreme Court denied several of Petitioner's claims with citation to In re

17  Waltreus, 62 Cal.2d 218, 225 (1965). The Ninth Circuit has repeatedly held the Waltreus rule

18  "is not sufficient to bar federal relief." Calderon v. United States District Court (Bean), 96 F.3d

19  1126, 1131 (9th Cir. 1996); Maxwell v. Sumner, 673 F.2d 1031, 1034-35 (9th Cir. 1982);

20  LaCrosse v. Kernan, 244 F.3d, 702, 705 n.11 (9th Cir. 2001). In Forrest, the Ninth Circuit again

21  stated "a Waltreus denial on state habeas has no bearing on [a habeas petitioner's] ability to raise

22  a claim in federal court." Forrest v. Vasquez, 75 F.3d 562, 564 (9th Cir. 1996). In a more recent

23  case, the Ninth Circuit reinforced this finding, stating "[t]he California Supreme Court's reliance

24  on *In re Waltreus* does not bar federal review." Hill v. Roe, 321 F.3d 787, 798 (9th Cir. 2003).

25    The Waltreus rule is not sufficient to bar federal review of claims 2 or 9.

26  **2.   Dixon, Seaton, Robbins, Clark, Harris and Miller**

27    The California Supreme Court also denied several of Petitioner's claims raised in both

28  state habeas petitions with citation to a myriad of other state procedural bars. The Ninth Circuit

1   has held that the Respondent bears the burden of pleading and ultimately proving the existence

2   of an adequate and independent procedural bar, with Petitioner bearing an interim burden of

3   placing the adequacy of the defense at issue. See Bennett v. Mueller, 322 F.3d 573, 585 (9th Cir.

4   2003).  Once the initial burden is met, the burden of placing the adequacy of the procedural bar

5   in issue shifts to the Petitioner and "[t]his must be done, at a minimum, by specific allegations

6   by the petitioner as to the adequacy of the state procedure.  The scope of the state's burden of

7   proof thereafter will be measured by the specific claims of inadequacy put forth by the

8   petitioner." Bennett, 322 F.3d at 584-85.  If Petitioner fails to meet this interim burden "federal

9   habeas review is barred unless the prisoner can demonstrate cause for the procedural default and

10   actual prejudice, or demonstrate that the failure to consider the claims will result in a

11   fundamental miscarriage of justice." Noltie v. Peterson, 9 F.3d 802, 804-805 (9th Cir. 1993);

12   Coleman, 501 U.S. at 750;  Park v. California, 202 F.3d 1146, 1150 (9th Cir. 2000).

13        However, established precedent in this Circuit dictates that a court's decision on the issue

14   of procedural default is to be informed by furthering "the interests of comity, federalism, and

15   judicial efficiency." Boyd v. Thompson, 147 F.3d 1124, 1127 (9th Cir. 1998).  Thus where, as

16   here, deciding the merits of a claim proves to be less complicated and less time-consuming than

17   adjudicating the issue of procedural default, a court may exercise discretion in its management

18   of the case to reject the claims on their merits and forgo an analysis of cause and prejudice.

19   Batchelor v. Cupp, 693 F.2d 859, 864 (9th Cir. 1982).

20        Accordingly, the Court declines to render an opinion on whether either party has carried

21   its burden under Bennett, or if Petitioner has established cause and prejudice sufficient to excuse

22   any procedural defaults, and will instead deny claims 6, 7, 9, and 10 on the merits.  While

23   acknowledging that it could not grant relief on a claim found to be procedurally defaulted absent

24   a showing of cause and prejudice or a fundamental miscarriage of justice, the Court is not

25   prevented from addressing the merits of these claims, and denying them based on a merits

26   review.

27   ///

28   ///

# V. STANDARD OF REVIEW

Title 28, United States Code, § 2254(a), sets forth the following scope of review for federal habeas corpus claims:

> The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in <u>violation of the Constitution or laws or treaties of the United States.</u>

28 U.S.C.A. § 2254(a) (West 2006) (emphasis added).

In <u>Lindh v. Murphy</u>, 521 U.S. 320, 336 (1997), the United States Supreme Court held that the new provisions of the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA") "generally apply only to cases filed after the Act (AEDPA) became effective." In capital habeas actions, cases are typically commenced by the filing of requests for appointment of counsel and stays of execution of the petitioners' death sentences. Petitioner filed his request for appointment of counsel and stay of execution on April 27, 2001, and filed his petition with the Court on May 6, 2002. The AEDPA became effective on April 24, 1996, when the President signed it into law. <u>See id.</u> Accordingly, the AEDPA applies to this case.

Relevant to this case are the changes AEDPA rendered to 28 U.S.C. § 2254(d), which now reads:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254(d)(1)-(2) (West 2006).[1]

---

[1] Although the California Supreme Court denied claims 2, 6, 7, 8, and 10 (claims 2, 6, and 10 in the first state petition, and claims 2, 3, 4, and 6 in the second state petition) on the merits as well as on procedural grounds, the Court did not provide any reasoning for the denial on the merits (with the exception of the Fourth Amendment aspect of claim 6). Therefore, as to claims 2, 6 (the Sixth Amendment aspect of the claim), 7, 8 and 10, the Court undertakes an independent review to determine whether the state court clearly erred in its application of controlling federal law. <u>Delgado v. Lewis</u>, 223 F.3d 976, 982 (9th Cir. 2000).

00cv2118

1    A decision is "contrary to" clearly established law if it fails to apply the correct controlling

2    authority, or if it applied the controlling authority to a case involving facts materially

3    indistinguishable from those in a controlling case, but nonetheless reaches a different result. See

4    Williams v. Taylor, 529 U.S. 362, 413 (2000). A decision involves an "unreasonable application"

5    of federal law if "the state court identifies the correct governing legal principle ... but

6    unreasonably applies that principle to the facts of the prisoner's case." Id.; Bruce v. Terhune, 376

7    F.3d 950, 953 (9th Cir. 2004).

8    Even when the federal court undertakes an independent review of the record in the

9    absence of a reasoned state court decision, the federal court must "still defer to the state court's

10   ultimate decision." Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002). If the state court

11   decision does not furnish any analytical foundation, the review must focus on Supreme Court

12   cases to determine "whether the state court's resolution of the case constituted an unreasonable

13   application of clearly established federal law." Greene v. Lambert, 288 F.3d 1081, 1089 (9th Cir.

14   2001). Federal courts also look to Ninth Circuit law for persuasive authority in applying

15   Supreme Court law and to determine whether a particular state court decision is an

16   "unreasonable application" of Supreme Court precedent. Davis v. Woodford, 384 F.3d 628, 638

17   (9th Cir. 2004).

18   The AEDPA further limits the circumstances under which district courts may grant an

19   evidentiary hearing. Section 2254(e) provides as follows:

20        If the applicant has failed to develop the factual basis of a claim in State
          court proceedings, the court shall not hold an evidentiary hearing unless the
21        applicant shows that:
               (A) the claim relies on:
22                  (i) a new rule of constitutional law, made retroactive to cases
             on collateral review by the Supreme Court, that was previously
23           unavailable; or
                    (ii) a factual predicate that could not have been previously
24           discovered through the exercise of due diligence; and
             (B) the facts underlying the claim would be sufficient to establish by
25           clear and convincing evidence that but for constitutional error, no
             reasonable factfinder would have found the applicant guilty of the
26           underlying offense.

27   28 U.S.C.A. § 2254(e)(2) (West 2006).

28   Under AEDPA, when determining whether to grant an evidentiary hearing, the district

-16-                                                                    00cv2118

court must first ascertain whether the petitioner has failed to develop the factual basis of the claim in state court. Insyxiengmay v. Morgan, 403 F.3d 657, 670 (9th Cir. 2005). As explained by the Supreme Court:

> For state courts to have their rightful opportunity to adjudicate federal rights, the prisoner must be diligent in developing the record and presenting, if possible, all claims of constitutional error. If the prisoner fails to do so, himself or herself contributing to the absence of a full and fair adjudication in state court, 2254(e)(2) prohibits an evidentiary hearing to develop the relevant claims in federal court, unless the statute's other stringent requirements are met.

Williams v. Taylor, 529 U.S. 420, 437 (2000).

If the petitioner has not failed to develop the facts in state court, an evidentiary hearing is required if (1) the petitioner establishes a colorable claim for relief – i.e., the petitioner alleges specific facts that, if proven, would entitle him to habeas relief, and (2) the petitioner did not receive a full and fair opportunity to develop those facts in state court. Earp v. Ornoski, 431 F.3d 1158, 1167 (9th Cir. 2005). The second requirement is met by a showing that:

> (1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair hearing.

Townsend v. Sain, 372 U.S. 293, 312 (1963), overruled on other grounds by Keeney v. Tamayo-Reyes, 504 U.S. 1 (1992).

## VI. DISCUSSION OF MERITS OF PETITIONER'S CLAIMS

Petitioner moves for summary judgment on claims 1 and 6 and moves for an evidentiary hearing on claims 1 and 4-10. Respondent opposes Petitioner's motion for summary judgment and/or evidentiary hearing as to all claims.

1.   **Claim 1 - Ineffective Assistance of Counsel**

Petitioner alleges his right to a fair and reliable judgment of death was violated due to the prejudicially deficient performance of counsel during both the guilt and penalty phases of his trial. (Amended Consolidated Petition for Writ of Habeas Corpus ["Pet."] at 9.) Specifically,

1  Petitioner contends that in the guilt phase, counsel unreasonably abandoned any defense strategy

2  that involved Petitioner's innocence or lack of intent for the murders, instead concentrating

3  their efforts on demonstrating Petitioner's innocence regarding the special circumstance

4  allegations.   (Id. at 33.)   Petitioner contends that counsel also unreasonably offered the

5  testimony of two experts who labeled Petitioner as "evil" and a "sociopath" based upon flawed

6  reasoning and inaccurate tests.  (Id. at 35.)

7        Petitioner alleges that, regarding the penalty phase, counsel failed to gather and present

8  available information on Petitioner's family history and upbringing, which would have allowed

9  properly qualified expert witnesses to offer the jury a more accurate picture of Petitioner and

10  would have, through direct testimony from those family members, given the jury a stronger case

11  for mercy and sympathy.  (Id. at 43-51.)  Petitioner maintains counsel's deficient performance

12  in failing to investigate and present this mitigation evidence to the jury resulted in prejudice to

13  Petitioner.  (Id. at 50-51.)

14        A.      The California Supreme Court's Ruling

15        The following statement of the issues presented by Petitioner on direct appeal, and the

16  California Supreme Court's resolution of those issues, is taken verbatim from that court's

17  opinion.  The state court rejected Petitioner's claims of ineffective assistance of counsel during

18  the guilt phase in relevant part as follows:

19        Defendant maintains he was deprived of effective assistance of counsel during the guilt
20        phase of the trial.  To establish constitutionally inadequate representation, a defendant
          must demonstrate that (1) counsel's representation was deficient, i.e., it fell below an
21        objective standard of reasonableness under prevailing professional norms; and (2)
          counsel's representation subjected the defendant to prejudice, i.e., there is a reasonable
22        probability that, but for counsel's failings, the result would have been more favorable to
          the defendant. (People v. Mitcham (1992) 1 Cal.4th 1027, 1058 [5 Cal.Rptr.2d 230, 824
23        P.2d 1277]; see Strickland v. Washington (1984) 466 U.S. 668, 687-696 [104 S.Ct. 2052,
          2064-2069, 80 L.Ed.2d 674].) "When a defendant on appeal makes a claim that his
24        counsel was ineffective, the appellate court must consider whether the record contains
          any explanation for the challenged aspects of representation provided by counsel. 'If the
25        record sheds no light on why counsel acted or failed to act in the manner
          challenged,"unless counsel was asked for an explanation and failed to provide one, or
26        unless there simply could be no satisfactory explanation," [citation], the contention must
          be rejected.'" (People v. Mitcham, supra, 1 Cal.4th at p. 1058; People v. Pope (1979) 23
27        Cal.3d 412, 425 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].)  Defendant has
          failed to meet his burden of establishing, on the record before us, that his trial counsel
28        was ineffective.

-18-

Defendant first complains of his counsel's explicit concession (in his opening statement) of defendant's guilt of the charges of first degree murder and burglary, and his additional concession (during closing argument) that if one special circumstance allegation were found true, all the special circumstance allegations necessarily were true. The record reflects that defense counsel conceded that defendant was guilty of first degree murder because of the felony-murder rule, but argued that defendant had no intent to kill. In light of the overwhelming evidence of defendant's guilt of the first degree murders of Nelia and Katherine Silva on a felony-murder theory, defense counsel reasonably may have determined that the only viable theory of defense was that defendant had lacked the intent to kill, an element that, at the time of the crimes (see *People v. Anderson, supra,* 43 Cal.3d 1104), was required as to each of the three alleged special circumstances. In that event, counsel's concession as to guilt was based upon a considered tactical determination. (See *People v. Wade* (1988) 44 Cal.3d 975, 988 [244 Cal.Rptr. 905, 750 P.2d 794]; *People v. Jackson* (1980) 28 Cal.3d 264, 292-293 [168 Cal.Rptr. 603, 618 P.2d 149].) We repeatedly have rejected claims that counsel was ineffective in conceding various degrees of guilt under similar circumstances. (See *People v. Freeman, supra,* 8 Cal.4th at p. 498; *People v. Mitcham, supra,* 1 Cal.4th at pp. 1060-1061.)

The record also fails to establish affirmatively that defense counsel's all-or-nothing approach with regard to the special circumstance allegations was not based upon a reasonable tactical decision. Counsel stated, "So if he's guilty of one special circumstance, he's obviously guilty of them all. And if he's not guilty of one, he's not guilty of them all, because they all happened basically at the same time." Counsel apparently determined that if the jury harbored a doubt as to whether defendant had intended to kill one of the two victims, it was reasonably possible the jury would conclude that defendant had lacked the intent to kill with respect to both of the victims, and thus return a finding of not guilty as to all three special circumstances. Defendant therefore has failed to demonstrate that counsel's position was not based upon a rational tactical decision under the circumstances.

Defendant next complains of counsel's asserted incompetence during argument in describing defendant as a "bizarre, violent attacker, preyer of women." These remarks, however, considered in the context of counsel's entire argument, indicate quite clearly that counsel was seeking to present a forceful argument of explanation that defendant's conduct was the result of an uncontrollable rage reaction-a reasonable strategic argument in light of the overwhelming evidence that defendant brutally and repeatedly had bludgeoned his two vulnerable victims on the face and other parts of the head.

In a related argument, defendant asserts that an attorney may not concede to a jury the guilt of his client without the consent of the client. He cites *People v. Diggs* (1986) 177 Cal.App.3d 958, 970 [223 Cal.Rptr. 361], in support of this proposition, maintaining that counsel's concessions as to defendant's guilt violated this rule. We observe that the record fails to disclose the nature or extent of defendant's involvement in, or explicit approval of, his counsel's trial strategy with regard to concessions of defendant's guilt, and therefore fails to support defendant's claim that he did not consent to those concessions or any other aspect of his defense. Moreover, the record reflects that defense counsel conceded only those charges for which there was no viable defense, and therefore did not deprive defendant of any meritorious defense without his client's consent. (Cf. *People v. Diggs, supra,* 177 Cal.App.3d 958, 970 [where counsel incompetently deprived his client of a potentially meritorious defense, he improperly conceded his client's guilt].) We find no error. (See *People v. Griffin* (1988) 46 Cal.3d 1011, 1029 [251 Cal.Rptr. 643, 761 P.2d 103]] [no waiver required even though defense counsel expressly "conceded defendant's responsibility for the killing"].)

Defendant next complains that counsel was deficient in preparing and presenting the

-19-

testimony of the defense mental health expert witnesses.  Defendant criticizes both the choice of psychologists Friedman and Saddick as the defense mental health experts as well as various aspects of their testimony which, according to defendant, demonstrate that these witnesses were unqualified in their fields to performs the tasks assigned, relied upon incomplete background data and testing, and lacked adequate preparation to present their testimony effectively.

Regardless whether there were any negligent omissions by counsel in the preparation and presentation of mental health evidence, however, defendant has failed to demonstrate that but for counsel's alleged incompetence a reasonable probability exists that the result of the guilt phase (or penalty phase) would have been more favorable to defendant.  In light of defense counsel's concession of defendant's guilt of two counts of first degree murder, the testimony of the defense experts relating to defendant's mental condition was admissible solely to the extent relevant to the specific issue whether defendant intended to kill his victims.   Both of the witnesses in question (who were licensed psychologists) testified that defendant suffered from brain damage that would cause unmodulated, explosive, and "rage" reactions in novel and stressful situations, as well as "viscosity," signifying that once engaged in aggressive behavior, defendant was unable to discontinue his actions.  This testimony was relevant to the issue of intent to kill, and defendant has failed to establish on this record the likelihood that, but for counsel's alleged failings in selecting and preparing the experts, mental condition testimony would have been presented that would have resulted in a finding more favorable to defendant on this issue. Defendant therefore has failed to establish the second prong required for a successful claim of ineffectiveness of counsel—prejudice—and his claim must fail. (See *Strickland v. Washington, supra,* 466 U.S. at p. 696 [104 S.Ct. at p. 2069]; *People v. Price* (1991) 1 Cal.4th 324, 440 [3 Cal.Rptr.2d 106, 821 P.2d 610].)

Samayoa, 15 Cal. 4th at 845-48.

The California Supreme Court also concluded that Petitioner did not receive ineffective assistance of counsel during the penalty phase, as follows:

Defendant further contends he received ineffective assistance of counsel at the penalty phase. We apply the same standard in reviewing this claim as we do in our evaluation of defendant's claim of ineffective assistance of counsel at the guilt phase. (See *People v. Mitcham, supra,* 1 Cal.4th at p. 1058.)

Defendant argues that he was deprived of the effective assistance of counsel because of his attorney's failure to object and to request an admonition as to each challenged aspect of the prosecution's argument. The mere failure to object to prosecutorial argument, however, rarely establishes incompetence on the part of defense counsel in the absence of some explanation on the record for counsel's action or inaction. (*People v. Wharton, supra,* 53 Cal.3d at p. 567; *People v. Ghent* (1987) 43 Cal.3d 739, 772 [239 Cal.Rptr. 82, 739 P.2d 1250].) Defendant has failed to demonstrate that any exception to this rule applies in the present case.

Moreover, with respect to all of the challenged comments [FN12] (considered in context, individually or together), we conclude no reasonable likelihood exists that the jury construed or applied any of the argument in an improper fashion. (*People v. Berryman, supra,* 6 Cal.4th at p. 1072.)

> FN12 Defendant complains the prosecution "misstated the legal definition of aggravating factors by including elements of the crime as separate factors." The record does not support this claim. Although the

-20-

prosecution described in detail each aspect of the crimes, contrary to defendant's implication it did not define the elements of the crimes as separate factors in aggravation.

Defendant also complains of numerous aspects of the prosecution's argument, as follows: (1) the comment that during the jury selection process, at the moment the jurors first saw the crime scene photographs, they must have known they would be involved in the penalty determination process; (2) the comments that defendant had been released from prison shortly before his commission of the crimes, had lied to the police, and had watched Mr. Silva being taken away from the crime scene as a suspect; (3) the comment that at the conclusion of defendant's interviews with the police, defendant had inquired whether he would obtain anything in exchange for his confession, thus demonstrating a lack of remorse; (4) the comment that the jury could not consider in mitigation any sympathy for defendant's family; (5) the comment that "we are certain who did it. We are certain who killed those two people"; (6) the prosecution's delineation of defendant's prior convictions as both prior violent activity and as prior felony convictions; (7) the criticism of defendant's mental defect evidence as "bogus"; (8) the request that the jury view the case through the victims' eyes; and (9) the remark the victims no longer would be able to have photographs taken of them.

Defendant next contends he was denied effective assistance because of remarks made by his attorney during the defense's penalty phase opening statement and argument that (according to defendant) amounted to a plea for sympathy for defense counsel personally rather than for defendant.

"The decision of how to argue to the jury after the presentation of evidence is inherently tactical" (*People v. Freeman, supra,* 8 Cal.4th at p. 498), and there is a "strong presumption" that counsel's actions were sound trial strategy under the circumstances prevailing at trial. (*Ibid.*) Defendant first complains of counsel's remarks during opening statement that counsel had been devastated by the jury's verdict as to guilt and the special circumstances, and that defendant's life, "as we know life to be, effectively ended when you came back with that last verdict." The trial court admonished counsel to forgo comments on his personal reactions during opening statement. Shortly thereafter, counsel told the jury one of his fears in the case was that he might have said or done something during the guilt phase that offended the jury. The court again reprimanded counsel for the injection of his personal thoughts into the statement.

Regardless whether the foregoing remarks constituted proper argument, they did not constitute deficient representation. The remark regarding the devastation experienced by defense counsel in light of the verdicts indicated that counsel continued to identify with defendant and his case, and could not reasonably have been construed by the jury in a manner prejudicial to defendant. By remarking that counsel feared he might have offended the jury, he indicated that perhaps he was to blame for the jury's verdicts against defendant, again demonstrating a belief in defendant's case that could not reasonably have been prejudicial to the defense.

Defendant also criticizes several of the remarks made by defense counsel during closing argument. He cites counsel's statement that he felt honored to be arguing in favor of someone's life, but "[o]n the other hand, I just can't help but feel somewhat inadequate to do such an enormous task." Defense counsel apparently sought to convey to the jury that if by his argument he was unable to persuade it that the appropriate punishment was life imprisonment, the jury should not automatically assume the appropriate punishment was death, but only that counsel was inadequate for the task. There is no reasonable likelihood that the jury construed these remarks in a manner prejudicial to defendant.

1

2

3

4

Defendant further complains of counsel's comment concerning "impossible cases" and observation that in such cases he had learned never to give up, because "[w]hen you feel every ounce of strength in your heart has been given on the case, you reach down and you try to get a little more." Defense counsel then quoted Clarence Darrow regarding the death penalty, to the effect that the jury was faced with the task of balancing "humane feeling against brutal feelings," and that a person who liked to see suffering out of righteous indignation would "hold fast to capital punishment."

5

6

7

8

9

Contrary to defendant's assertion, these remarks do not suggest that counsel was seeking to elicit sympathy for himself because counsel felt he had had an impossible case. Counsel simply was being candid with the jury by acknowledging that the case was difficult, that he had given it everything he had, and that he would seek to give more. This line of argument implied there was more to give, i.e., there was additional matter favorable to the defense that would be presented to the jury, and did not imply merely that the jury should feel sorry for defense counsel. The argument did not demonstrate deficient performance.

10

11

12

13

14

15

Defendant next complains counsel was ineffective in failing to present penalty phase expert testimony regarding mental disorders suffered by defendant at the time of the commission of the crimes. He claims that, although the trial court barred such evidence at the guilt phase, there was no impediment to presenting-or tactical purpose in declining to present-such evidence at the penalty phase. Defendant additionally complains that defense counsel acknowledged that the jury must have disbelieved the defense mental disorder evidence presented at the guilt phase. Finally, defendant's [sic] complains of defense counsel's failure to explain to the jury that, in the event it was not persuaded by the evidence of defendant's mental disorders that defendant had been "under the influence of extreme mental or emotional disturbance" within the meaning of factor (d) of section 190.3, such evidence nevertheless remained available for consideration in mitigation under factor (k) of section 190.3.

16

17

18

19

20

With respect to each of the foregoing objections to defense counsel's performance, however, the record fails to demonstrate affirmatively that there was no rational tactical purpose for counsel's actions or omissions. With regard to counsel's failure to present additional evidence of defendant's mental condition at the time of the commission of the crimes, defendant has failed to establish on this record what additional evidence would have been presented. Moreover, defense counsel may well have determined that doing so would lead to reexamination of the details of the brutal murders of a mother and her two-year-old daughter, and thus may have decided as a reasonable tactical matter to avoid exposing the jury once again to this evidence.

21

22

23

24

25

26

27

Additionally, contrary to defendant's assertion, his counsel did not state that the jury must have disbelieved the defense expert testimony presented at the guilt phase. Rather, counsel simply acknowledged candidly that the thrust of his guilt phase argument had related to defendant's lack of intent to kill because of brain damage, and that the jury had "rejected the brain damage totally, or felt that even if he had the brain damage, he still had the intent to kill." Counsel did not argue or concede that the jury had disbelieved testimony upon which he was asking it to rely at the penalty phase. The record establishes that defense counsel argued that a life sentence was appropriate because of defendant's extreme mental disorders, and in light of the trial court's instruction on section 190.3, factor (k) counsel reasonably may have determined that the jury adequately was informed that it could consider the mental health evidence in mitigation under factor (k).

<u>Samayoa</u>, 15 Cal. 4th at 855-58.

28

1    In his first state habeas petition, Petitioner presented a claim of ineffective assistance of

2  counsel alleging trial counsel failed to investigate and present mitigation evidence regarding his

3  upbringing at the penalty phase, which included physical, emotional and sexual abuse, substance

4  abuse, poverty and a family history of criminal activity.  Petitioner attached numerous exhibits

5  and declarations to the state petition.  This claim, raised as claim VI of the state habeas petition,

6  was denied on the merits by the California Supreme Court without a reasoned opinion.  (Doc.

7  No. 69; Lodgment No. 4.)

8    B.  Respondent's Procedural Argument

9    Respondent contends that only one declaration (that of trial counsel Michael Marrinan)

10  of the 22 declarations attached to the instant Petition was presented to the California Supreme

11  Court.  Respondent argues that Petitioner has therefore failed to properly develop the claim in

12  state court, precluding an evidentiary hearing or expansion of the record under § 2254(e)(2), and

13  the Court's decision must therefore be based solely on those materials that were presented to the

14  state supreme court.  (Respondent's Opposition to Motion for Summary Judgment ["Opp. to

15  MSJ"] at 6.)[2]

16    However, an examination of the record on appeal reveals that numerous exhibits were

17  attached to the first state habeas petition, including declarations by Mercedes Samayoa

18  (Petitioner's mother), Bernadene Severns (Petitioner's cousin) and Marie Alarcon (Petitioner's

19  cousin) in addition to numerous birth records, family history records and court documents and

20  police reports.  The declarations offer details on Petitioner's family history of molestation,

21  violence, substance abuse, as well as the physical and emotional child abuse prevalent in the

22  Samayoa family during Petitioner's childhood and adolescence.  (Doc. No. 69; Lodgment No.

23

24    [2] Respondent also states that "an examination of the appellate and habeas records reflects that
most of the information contained in the more recently prepared declarations was actually presented to
25  the California Supreme Court in Petitioner's first state habeas petition, so there is no need to remand
this matter to state court to exhaust this claim."  (Answer to Petition for Writ of Habeas Corpus
26  ["Ans."] at 26.)  This argument seems to run contrary to Respondent's procedural argument advanced
above.  Nevertheless, the Court acknowledges that further exhaustion of the claim is unnecessary as
27  Petitioner's federal claim is fundamentally the same as the claim he raised in state court.  See Gray v.
Netherland, 518 U.S. 152, 163 (1996) (To satisfy exhaustion requirements, Petitioner must have
28  presented the same factual basis and legal theory in state court for the claim he presents in federal court).

1    9, Exs. 3, 5, 6.)  Petitioner also supplemented his state habeas petition with copies of police

2    reports and court documents detailing criminal activity and violence in the family, including

3    documents on one instance of child sexual abuse committed by a male relative. (Id., Exs. 12, 29,

4    30, 31, 32, 34.)  The Court also notes that the California Supreme Court initially granted $3,000

5    to state habeas counsel for investigation, and state counsel filed several additional requests

6    between 1995 and 1997 for $32,000 in funds for retaining a neuropsychologist and to investigate

7    Petitioner's history of abuse, which were all denied by the court.  In 2003, current habeas counsel

8    requested $15,000 in funds from the state court to retain experts and conduct investigation in

9    this case, which was also denied.  Petitioner also requested an evidentiary hearing on this claim

10   in state court.  (Doc. No. 69; Lodgment No. 8 at 53.)

11           Respondent takes particular issue with the inclusion of the declaration of Alice Girdley,

12   signed in 2002, which was not presented to the state court.  In the declaration, Ms. Girdley states

13   that she spoke to one of Petitioner's trial attorneys in 1986, who advised her that he "did not

14   want to hear the negative things" about Petitioner and their family.  Respondent contends that

15   the state court was never presented with this information, and this Court may not consider it in

16   evaluating Petitioner's ineffective assistance of counsel claim.  The Girdley declaration was

17   attached as an exhibit to the federal petition first filed in the Court in January 2002, and while

18   Respondent did assert that this claim was partially unexhausted, the allegation was premised on

19   Petitioner's alleged addition of a new legal theory; Respondent did not complain that new factual

20   allegations had been appended to Petitioner's claim for relief.  Further, on April 9, 2002, the

21   Court ruled that "exhaustion is in fact complete on claim 1," and declined to return the claim

22   to state court for any additional proceedings. (See Doc. No. 29.)  The Court will not revisit that

23   ruling, nor entertain Respondent's new and belated challenge to the Girdley declaration that

24   should have been raised when the federal petition was initially filed.

25           Diligence requires that a petitioner "seek an evidentiary hearing in state court in the

26   manner prescribed by state law." Williams, 529 U.S. at 437.  To satisfy this standard, a petitioner

27   is required to make a "reasonable attempt, in light of the information available at the time, to

28   investigate and pursue claims in state court." Id. at 435.  Under California state law standards,

                                        -24-                              00cv2118

a state habeas petition is required to: "(1) state fully and with particularity the facts on which relief is sought, as well as (2) include copies of reasonably available documentary evidence supporting the claim, including pertinent portions of trial transcripts and affidavits or declarations." People v. Duvall, 9 Cal.4th 464, 474 (1995).

The Court finds this case shares much in common with Landrigan v. Schriro, 441 F.3d 638 (9th Cir. 2006), in which the Ninth Circuit held a petitioner did not fail to develop his claim when he made specific factual allegations in his state petition, requested an evidentiary hearing, and supported his state petition with declarations and documentary evidence. The circuit court found petitioner's efforts sufficient to demonstrate that he, through no fault of his own, tried and failed to develop his habeas claim in state court, and that section 2254(e)(2) did not apply in that case. See Landrigan, 441 F.3d at 648 (9th Cir.), reversed on other grounds, Schriro v. Landrigan, 550 U.S. 465, 127 S.Ct. 1933 (2007).

In finding a federal habeas petitioner diligent in presenting his claim to the state court, where the petitioner submitted one letter and three declarations in support of his state petition, another California district court reasoned as follows:

> Specifically, the court does not read California law to require that every document that a petitioner intends to introduce at an evidentiary hearing be submitted along with the state habeas petition . . . As long as sufficient evidence, though perhaps not every bit of evidence, is attached to the state habeas petition to support the facts alleged by petitioner, then the petitioner's burden to show that the claims are not conclusory has been met.

Osband v. Ornoski, No. S-97-0152, slip op. at 6 (E.D. Cal. Dec. 1, 2005).

In the instant case, Petitioner supported his state court claim of ineffective assistance of counsel with three declarations and numerous other documents, which the Court finds sufficient to show his diligence in pursuing this claim in state court, and the Court rejects Respondent's contention that an evidentiary hearing or expansion of the record to include the declarations submitted by Petitioner is precluded under § 2254(e)(2). See Holland v. Jackson, 542 U.S. 652-53 (2004); Cooper-Smith v. Palmateer, 397 F.3d 1236, 1241 (9th Cir. 2004). Thus, the Court will consider all of Petitioner's proffered exhibits in evaluating his federal claim.

C.    Merits

Generally, to prevail on a claim alleging ineffective assistance of counsel, a petitioner must demonstrate (1) that counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," and (2) that "the deficient performance prejudiced the defense." Campbell v. Wood, 18 F.3d 662, 673 (9th Cir. 1995) (quoting Strickland v. Washington, 466 U.S. 668, 687 (1984)).

To establish deficient performance, the petitioner must demonstrate that the representation he received "fell below an objective standard of reasonableness." Strickland, 466 U.S. at 688. Due to the difficulties inherent in evaluating the contested behavior from counsel's perspective at the time, there exists a strong presumption that counsel's conduct "falls within the wide range of reasonable professional assistance." Id. at 689. Thus, a petitioner must overcome the presumption that the challenged action might be considered sound trial strategy. Id. at 689.

To establish prejudice, the petitioner must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. In addition, individual deficiencies that may not by themselves meet the Strickland prejudice standard may, when considered cumulatively, constitute sufficient prejudice to justify granting the writ. Harris v. Wood, 64 F.3d 1432, 1438 (9th Cir. 1995).

1.    Guilt Phase

Petitioner asserts that the mental health experts retained by defense counsel were improperly selected and not qualified for the tasks they were selected to accomplish. (Pet. at 9.) Petitioner contends that, as a result of counsel's ineffective performance in retaining these witnesses, Petitioner was subjected to the wrong tests, the experts were not qualified to render the evaluations and opinions they gave on the stand at trial, and were therefore dismantled during the cross-examination by the prosecutor. (Id. at 38.) Petitioner further asserts that defense counsel should have concentrated on negating the intent element of special circumstances murder, but instead focused their guilt phase efforts on a theory of brain injuries and "rage" reaction. (Id. at 34.)

-26-

At trial, Dr. Meredith Friedman, a clinical psychologist, testified that the tests she performed suggested Petitioner suffered from temporal lobe damage, which contributed to his emotionally reactive personality and could cause overreaction to stressful events or a heightened rage reaction. (RT 3652-58.) Dr. Saul Saddick, a neuropsychologist, examined those test results and agreed with a finding of moderate damage to the left lobe, adding that this damage would cause a "viscosity" or stickiness to Petitioner's behavior and could contribute to a rage reaction, which Dr. Saddick explained as a combination that could result in a response out of proportion to a triggering action, accompanied by difficulty stopping the behavior once it had begun. (RT 3908-44.) On surrebuttal, Dr. Melvin Schwartz, a neuropsychologist and clinical pathologist, testified that he agreed with the findings of the two defense experts regarding frontal lobe damage, and added that any impairment in the brain could result in uncontrollable rage. (RT 4337-45.)

Trial counsel Michael Marrinan, in a declaration submitted to the Court, notes that part of his responsibilities at trial were to "work with the mental health experts we hired to testify at guilt phase," and admits that the experts were not informed about Petitioner's physical, emotional, and sexual abuse, or the drug and alcohol abuse in Petitioner's family, nor the extreme poverty or cultural values that affected his upbringing. (Ex. 4 to Motion for Summary Judgment ["Mot. SJ"].) Marrinan concedes that the defense "had no tactical reason for not discovering the facts listed above and in not presenting this information to the mental health experts." (Id.) However, even if the Court found Marrinan's statement sufficient to meet the Strickland deficient performance prong for the guilt phase of trial, Petitioner must also establish prejudice to succeed on this claim. See Strickland, 466 U.S. at 688-94.

In support of the prejudice prong, Petitioner presents the Court with the declaration of Dr. Mark Bondi, a clinical neuropsychologist who was not involved at the trial stage, but who reviewed Petitioner's past educational, medical and mental health reports, evaluations, psychological testing data, medical test results, and conducted interviews with Petitioner's family members. In a declaration made fourteen years after the verdict, Dr. Bondi criticizes the expert trial testimony of Dr. Saddick and Dr. Friedman, and the tests that formed the basis of their

1    testimony.  Ultimately, Dr. Bondi states that he concurs with the assessment of prosecution

2    expert Dr. Butters, and opines that Petitioner's test results and IQ levels "do not support ... a

3    claim that the defendant's mental state precluded a formation of intent to kill." (Ex. C-3 to Pet.

4    at 20.)  Dr. Bondi further opines that Dr. Saddick's conclusion of "left hemisphere brain damage

5    is not well-supported and can be ascribed to a whole host of possible other influences (e.g.,

6    bilingualism, ethnicity, learning disabilities, dyslexia, delinquency, and psychopathy.)" (Id. at

7    15.)  While Dr. Bondi notes some errors in scoring the test findings, and that some of the tests

8    performed were not the newest versions available, his declaration does not suggest an alternative

9    guilt phase strategy that demonstrates any reasonable possibility of a changed verdict.  Based on

10   Dr. Bondi's belated analysis of Petitioner's mental state, trial counsel cannot be censured for

11   relying upon the sworn testimony of two licensed psychologists.

12        Petitioner also proffered a declaration by Dr. Bruce Hubbard, who opines that the

13   "defense effort took far too narrow an approach in attempting to define mere brain damage as

14   correlative to his [Petitioner's] aggressive behavior" but who ultimately stated that Petitioner's

15   "reaction in situations of stress [was] very unpredictable," and people such as Petitioner "often

16   times have a 'hair trigger' for their anger, which can be precipitated to proportions of a rage by

17   stimuli that would not so affect normal individuals." (Ex. 17 to Mot. SJ.)  Dr. Hubbard also

18   criticized the data which the defense experts relied upon in reaching their conclusions, but

19   nevertheless reached a similar opinion as Drs. Friedman, Saddick and Schwartz, and offers no

20   viable alternative to the defense theory at trial.  The Ninth Circuit has plainly held that the

21   pursuit of one defense strategy at the expense of another is a tactical decision "for which there

22   is no correct answer, only second guesses." Hendricks v. Calderon, 70 F.3d 1032, 1041 (9th Cir.

23   1995).[3]

24        The state court held that Petitioner failed to demonstrate that, but for counsel's alleged

25   failings, a reasonable probability exists that if effective mental health evidence was presented in

26

27        [3] The Court also notes that Petitioner proffers a signed declaration from Edward Rucker, Esq.,
     who expounds at length regarding trial counsels' deficient performance during the penalty phase of trial,
28   but levies no such charge at counsels' guilt phase performance. (See Ex. 20 to Mot. SJ.)

1   the guilt phase of trial, it would have resulted in a more favorable outcome for Petitioner.  The

2   state court's conclusion was correct.  Even if counsels' performance was deficient, Petitioner has

3   not established prejudice.

4          Further, trial counsel's guilt phase strategy itself was reasonable, especially in light of

5   Petitioner's multiple confessions to law enforcement authorities and the other evidence against

6   him at trial, which included testimony by his own family members regarding the murder weapon

7   and Petitioner possessing items stolen from the victims' home during the murder.  That trial

8   counsel's strategy was ultimately unavailing does not lead the Court to conclude that it was not

9   a reasonable and tactical decision.  See Strickland, 466 U.S. at 689 (Judicial scrutiny of trial

10  counsel's decisions is "highly deferential" as "it is all too easy for a court, examining counsel's

11  defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel

12  was unreasonable.")

13         The California Supreme Court's adjudication of the guilt phase aspect of Petitioner's

14  ineffective assistance of counsel claim did not involve an unreasonable application of federal law,

15  nor was it based on an unreasonable determination of the facts.  Williams, 529 U.S. at 412-13.

16  Petitioner is not entitled to habeas relief on this portion of claim 1.

17              2.    Penalty Phase

18         Petitioner contends that trial counsel failed to ascertain the existence of mitigation

19  evidence and failed to present the available mitigation evidence to the jury at the penalty phase

20  of trial, by not interviewing and calling Petitioner's family members to testify at the penalty

21  phase, and failing to offer expert psychological testimony at the penalty phase.  (Mot. SJ at 13-

22  14.)  Petitioner specifically asserts that trial counsel failed to investigate and gather readily

23  available evidence on his family background, which included a childhood of physical, emotional

24  and sexual abuse, an atmosphere of violence and criminality, and drug and alcohol abuse, and

25  present this evidence in mitigation at the penalty phase.  (Id.)  Petitioner contends that he was

26  prejudiced by counsel's deficient performance, as "[t]he jury had nothing upon which to base any

27  sympathy for Petitioner.  All that they would hear on penalty phase was that Petitioner was a

28  fairly decent worker in prison and that his mother and sisters would feel bad if he was executed

1    because they were the ones who turned him into the police. This pathetic presentation stood

2    in brutal contrast to petitioner's record of criminal violence, crimes against women and this

3    unspeakable crime itself." (Pet. at 11.)

4         In his penalty phase opening argument, trial counsel noted that the jury "rejected the

5    brain damage totally, or felt that even if he had the brain damage, he still had the intent to kill,"

6    but informed jurors that they could still "consider the evidence you heard in the guilty phase,

7    particularly Dr. Butters' testimony, the prosecution expert who didn't rule it out. He still said

8    there was a possibility of brain damage." (RT 4706.) Counsel also cautioned the jury to keep

9    their minds open to mitigation evidence.

10        The defense offered testimony from a few correctional officers who had worked with

11   Petitioner and a few immediate family members. The officers generally testified that Petitioner

12   was a good, reliable, above-average worker in prison. Petitioner's mother testified that she loved

13   her son, and showed the jury cards he had sent her while incarcerated. Two of Petitioner's sisters

14   also testified, stating that they did not want their brother to receive the death penalty, and felt

15   guilty because they had turned in evidence on the case and had testified against him at the guilt

16   phase of trial.

17        In closing, trial counsel admitted that "the facts of the crime are aggravating, there is no

18   question about that," but asserted that in mitigation, the crime "certainly may have been

19   committed as either the result of a direct or perhaps even indirect result of some type of mental

20   defect or brain damage" and could be attributable to "something that makes him go from a Jekyl

21   [sic] to a Hyde." (RT 5023-26.) Counsel then implored the jury to consider as mitigating the

22   fact that Petitioner "did confess to Detective Jordan" and told the truth about the crime, and

23   argued that "there seems something brutally unfair about killing someone who helped the police

24   convict him." (RT 5026-28.) Counsel also argued the murders "were not the result of a

25   premeditated, planned killing" and Petitioner's job performance in prison showed he could be

26   reliable and productive, and he committed no violent acts in prison, which should be both

27   considered in mitigation. (RT 5029-30.) Counsel added that Petitioner's "artistic ability" gave

28   his family "small joys" that would end if he were executed, and stated that Petitioner's family

-30-                                                    00cv2118

1  suffered great guilt for testifying against him, which would only increase if Petitioner were sent

2  to death row and later executed.  (RT 5022-23; 5033-34.)

3             a.    <u>Performance</u>

4       In support of this claim, Petitioner presents thirteen declarations from friends and family

5  members, accompanying his own declaration, detailing the abusive and dysfunctional

6  environment in which he was raised.  (Exs. 3, 5-15, 18-19 to Mot. SJ.)  Petitioner also offers a

7  social history prepared by psychologist Gretchen White, Ph.D and M.F.C., who interviewed

8  Petitioner, members of his immediate and extended family, and a family friend, and reviewed

9  numerous documents.  Ms. White states that Petitioner was born and raised in a corrosive and

10  corruptive environment of epidemic violence, alcohol and drug abuse, physical, emotional, and

11  child sexual abuse, with no feeling of safety or stability and in which little behavior was reserved

12  for adults.  Moreover, Ms. White observes that the nuclear family was inseparable from his

13  extended family on his mothers's side, Petitioner and others were discouraged from socializing

14  outside this dysfunctional extended family system, leaving Petitioner unfit to function outside

15  the family.  Ms. White states that Petitioner was beaten by his father and neglected by his

16  mother, and his uncles, the male role models in his life, were violent alcoholics and child

17  molesters.  Ms. White concludes that Petitioner is the product of this extremely dysfunctional

18  and incapacitating closed family system, which engendered feelings of helplessness and rage and

19  contributed significantly to his conduct as an adult.  (Ex. 16 to Mot. SJ.)

20       Respondent argues that "breaking his [Petitioner's] claim of ineffective assistance of

21  counsel down into several sub-claims does not make the alleged failure of trial counsel to obtain

22  and present this evidence to the experts or the jury more egregious.  Unless trial counsel knew

23  or should have known about this evidence in 1988, Petitioner is unable to demonstrate any

24  ineffectiveness.  Not a single declarant represents that they ever told any of this information to

25  either of Petitioner's trial attorneys or investigator."  (Ans. at 31.)

26       It is well established that trial counsel has a duty to investigate a client's background in

27  preparation for the penalty phase of a capital case.  See <u>Karis v. Calderon</u>, 283 F.3d 1117, 1135

28  (9th Cir. 2002).  The Supreme Court has held that an attorney's strategic decisions made after

1   careful and extensive investigation "are virtually unchallengable," but "strategic choices made

2   after less than complete investigation are reasonable precisely to the extent that reasonable

3   professional judgments support the limitations on investigation." Wiggins v. Smith, 539 U.S.

4   510, 521 (2003) (quoting Strickland, 466 U.S. at 690-91).  The Court's analysis of this claim

5   turns on whether the information trial counsel did obtain on Petitioner's background "revealed

6   the need to dig deeper." Douglas v. Woodford, 316 F.3d 1079, 1089 (9th Cir. 2003); see also

7   Wiggins, 539 U.S. at 523.  If such facts were discovered, the Court must evaluate whether

8   counsel failed to pursue valid avenues of investigation that could have affected the jury's

9   assessment of Petitioner.

10       Investigator Marion Pasas, who worked on Petitioner's defense team, states that

11   Petitioner's trial attorneys "did not understand or seem interested in the penalty phase.  There

12   was no strategizing about the penalty phase and the penalty phase investigation was not up to

13   par," and adds that "[co-counsel Michael] Popkins felt the jury would save Richard for Mike's

14   sake, and because they liked him, and would feel sorry for the sister, and the mom." (Ex. 1 to

15   Mot. SJ at 1.)  Ms. Pasas also states that "Popkins did not spend time with Richard's family," that

16   she "had to force him to go see Richard's grandma Inez," and admits she has "always felt that

17   there were many things about Richard's life that were never uncovered." (Id. at 2.)

18       In a letter Ms. Pasas sent to counsel Popkins in March 1987, a year before the trial, Pasas

19   stated that she began interviews with Petitioner's family "but these interviews are far from

20   complete" because his family is "very quiet and do not give up information easily." (Ex. 2 to

21   Mot. SJ.)  Ms. Pasas noted that she had located two good penalty phase witnesses in Petitioner's

22   "grandmother and aunt" and stated that the picture seems to be of a "marginally functioning

23   family." (Id.)  Moreover, the Court notes that ten members of Petitioner's extended family,

24   including several aunts, uncles, cousins and family friends declare that they were living in the

25   San Diego area at the time of Petitioner's trial, were available and willing to testify on his behalf,

26   but none of these individuals were ever contacted by the defense. (See Exs. 5, 6, 8-11, 13-15,

27   19 to Mot. SJ.)  Petitioner's cousin Benny Girdley and ex-wife Sophia Samayoa Lopez state they

28   were interviewed by the defense investigator, but neither were asked about areas such as abuse,

1  drugs, alcohol, or violence. (See Ex. 7, 18 to Mot. SJ.) Further, neither of these individuals were

2  called to testify despite their willingness to be witnesses on Petitioner's behalf.

3      Petitioner's aunt, Alice Girdley, was also interviewed by Ms. Pasas in 1987. Further, Ms.

4  Girdley was later interviewed by one of Petitioner's defense counsel who she states "did not want

5  to hear what I had to say." (Ex. 3 to Mot. SJ at 1.) Ms. Girdley adds "[t]he Attorney told me

6  that he did not want to hear the negative things about Richard or the family, and if she had been

7  asked about it or permitted to do so, she would have told him all about "the molests, abuse,

8  violence, alcohol and drug use that existed in my extended family." (Id. at 2.) If called during

9  the penalty phase, these witnesses would have testified that Petitioner was raised by an

10 emotionally absent mother and a physically abusive father, that Petitioner started using and later

11 abusing alcohol and drugs at an early age, and that Petitioner and other children in the family

12 were subjected to sexual abuse and molestation by members of their extended family. (See Exs.

13 3, 5, 6, 7, 8, 9, 10, 13, 14, 18, 19 to Mot. SJ.) These witnesses also would have informed the jury

14 of the impoverished, violent, and criminally active extended family environment in which

15 Petitioner was reared. (See id.)

16     Edward Rucker, a former capital case trial attorney and current criminal defense attorney,

17 states that based upon his experience and knowledge of the prevailing standards of capital trial

18 counsel during 1985-1988, when Petitioner's case was investigated and tried, defense counsel's

19 penalty phase performance "fell below the level of professional competence" and counsel

20 presented a "factually flawed defense lacking in viability." (Ex. 20 to Mot. SJ at 3.) Rucker adds

21 that no competent attorney would have "been ignorant of the widely understood fact that a

22 history of child abuse, learning disability, limited intelligence, closed head injuries, and drug and

23 alcohol abuse had potential legal significance for adult behavior." (Id. at 4.) Rucker concludes

24 that "[b]ased upon my experience, I can think of no tactical reason for the failure to develop and

25 present such evidence in mitigation. Given the evidence in aggravation presented by the

26 prosecution, such a failure seems inexcusable. The adverse consequences to petitioner of this

27 failure were compounded when petitioner's counsel presented Richard Samayoa's mother and

28 sister to testify about the close nurturing nature of the family" and this failure prejudiced

1   Petitioner.  (Id. at 9-10.)

2     Trial counsel was appointed to Petitioner's case in April 1986, and it was at the

3   conclusion of the guilt phase proceedings on April 21, 1988 when counsel Michael Popkins wrote

4   an entry in his attorney log that stated, "Verdicts guilty. *Started working* on the penalty phase."

5   (Ex. D-1 to Pet. at 31-32) (emphasis added).  In the excerpts from Mr. Popkins' log provided by

6   Petitioner, the Court also notes an entry indicating trial counsel meeting with Marion Pasas in

7   April 1986 to discuss the "nature and extent of guilt and penalty phase investigations. (Ex. D-1

8   to Pet. at 1.)  The Court notes a few entries in Mr. Marrinan's activity log regarding penalty

9   phase research in November and December 1987, but located no other discernible references to

10  penalty phase work until after the guilt phase had concluded. (See Ex. D-2 to Pet. at 12, 22, 23.)

11  It appears counsel worked full time on preparing for the penalty phase between the conclusion

12  of the guilt phase on April 21, 1988 and the start of the penalty phase proceedings on May 2,

13  1988, but invested little attorney time in preparing for this prospect between his appointment

14  to the case and the commencement of trial.   This apparent lack of timely preparation for the

15  possibility of a penalty phase is all the more troubling knowing counsel was faced with

16  constructing a guilt phase defense in a capital trial representing a criminal defendant who had

17  confessed to law enforcement authorities on three separate occasions and whose immediate

18  family members had provided circumstantial physical evidence to the police and were set to be

19  called as witnesses for the prosecution during the guilt phase.

20    Michael Marrinan, co-counsel at trial, states that the defense team would have presented

21  evidence, had they known of it, regarding the poverty, child sexual abuse widespread in

22  Petitioner's family, the physical and emotional abuse he suffered at the hands of his mother and

23  father, Petitioner's learning disabilities, and evidence that he was raised among a family whose

24  members were "convicted of crimes involving alcoholism, drug abuse, spousal abuse and weapon

25  possession." (Ex. 4 to Mot. SJ.)  Mr. Marrinan concedes "[t]he defense team had no tactical

26  reason for not discovering the facts listed above and in not presenting this information to the

27  mental health experts and to the jury as mitigation for the crimes." (Id.)

28    To prove deficiency of performance, the Supreme Court has held that a petitioner must

00cv2118

1  demonstrate that trial counsel made errors so serious that their performance fell below an

2  objective standard of reasonableness under prevailing professional norms. Strickland, 466 U.S.

3  at 687-88.   Additionally, "the defendant must overcome the presumption that, under the

4  circumstances, the challenged action 'might be considered sound trial strategy.'" Id. at 689

5  (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)).   The Ninth Circuit has held that a

6  failure to sufficiently investigate a defendant's background and provide background information

7  to mental health experts may constitute deficient performance. See Ainsworth v. Woodford, 268

8  F.3d 868 (9th Cir. 2001) (trial counsel found deficient for failing to obtain evidence of troubled

9  childhood, past drug and alcohol abuse, failing to interview a witness until just before their

10 testimony, and obtaining records but failing to examine them); see also Bean v. Calderon, 163

11 F.3d 1073 (9th Cir. 1998) (trial counsel rendered deficient penalty phase performance in

12 retaining mental health experts but failing to provide them with the essential background

13 information to render a diagnosis of defendant).

14      Taking into consideration the available mitigation evidence set forth in the numerous

15 declarations, the Court's review of counsel's activity log, and trial counsel's concession that there

16 was no tactical reason for failing to pursue this evidence, the Court finds counsel performance

17 was likely deficient in preparing for and conducting the penalty phase of Petitioner's trial.

18 Counsel failed to interview numerous readily available witnesses, and counsel was aware that

19 Petitioner had childhood injuries and abused alcohol and drugs, and yet failed to questions his

20 friends and relatives about these areas to ascertain the existence of potential mitigating evidence.

21      b.      Prejudice

22      To succeed on a claim of ineffective assistance of counsel, Petitioner must not only prove

23 counsel's performance was deficient, but must also demonstrate that "there is a reasonable

24 probability that, but for counsel's unprofessional errors, the result of the proceeding would have

25 been different." Strickland, 466 U.S. at 694. In evaluating the claim, the Court "must consider

26 the totality of the evidence before the judge or jury." Id. at 695. Moreover, the Ninth Circuit

27 has held that "[i]n establishing prejudice under Strickland, it is not necessary for the habeas

28 petitioner to demonstrate that the newly presented mitigation evidence would necessarily

1   overcome the aggravating circumstances." <u>Correll v. Ryan</u>, 465 F.3d 1006, 1018 (9th Cir. 2006).

2   A petitioner can establish prejudice by showing that, had all the available mitigation been offered

3   at the trial, "there is a reasonable probability that at least one juror would have struck a different

4   balance" between life and death.  <u>Wiggins</u>, 539 U.S. at 537; <u>see also</u> <u>Rompilla v. Beard</u>, 545 U.S.

5   374, 393 (2005) ("although we suppose it is possible that [the sentencer] could have heard it all

6   and still have decided on the death penalty, that is not the test.")

7          The process of determining penalty phase prejudice requires courts to "evaluate the

8   totality of the available mitigation evidence – both that adduced at trial, and the evidence

9   adduced in the habeas proceeding – in reweighing it against the evidence in aggravation."

10  <u>Williams</u>, 529 U.S. at 397-98; <u>see also</u> <u>Bonin v. Calderon</u>, 59 F.3d 815, 834 (9th Cir.

11  1995)(assessing prejudice requires a court to compare the prosecution evidence against the

12  totality of available mitigation evidence).  The Ninth Circuit has noted that a defendant's

13  culpability may be minimized, and a jury could reasonably be persuaded by mitigation evidence

14  showing "a person whose moral sense was warped by abuse, drugs, mental incapacity, or disease

15  or who acted out of passion, anger or other motive unlikely to reoccur." <u>Allen v. Woodford</u>, 395

16  F.3d 979, 1007 (9th Cir. 2005); <u>see also</u> <u>Boyde v. California</u>, 494 U.S. 370, 382 (1990) (a

17  defendant whose crime is attributable to a disadvantaged background or mental or emotional

18  problems may be less culpable than a defendant with no excuse).

19         Petitioner asserts that the potentially mitigating evidence trial counsel failed to offer

20  included evidence of childhood physical abuse by his father, emotional abuse by his mother,

21  sexual abuse by an uncle which Petitioner admitted to a female cousin, and pervasive sexual

22  abuse in his extended family including several uncles or cousins who are currently registered sex

23  offenders.  Petitioner also began to abuse alcohol and drugs- including marijuana, PCP, and

24  methamphetamine- at an early age, suffered several head injuries as a child, and was raised in

25  an extremely impoverished and violent family environment in which family parties often started

26  with drinking and ended with fist fights, bloodletting, and a visit from the police department,

27  including his own wedding.  During the guilt phase, the jury heard multiple experts testify about

28  Petitioner's head injuries, brain damage, and that Petitioner may have suffered a "rage reaction"

-36-                                                    00cv2118

1  on the night of the murders.  Trial counsel did not offer further psychiatric or other expert

2  testimony at the penalty phase, but in his penalty phase closing argument to the jury counsel did

3  refer to the possibility of brain damage as a cause for Petitioner's behavior.  Petitioner's mother

4  and two sisters testified on his behalf, speaking of cards and letters he had sent them over the

5  years and talking of Petitioner's love for his daughter.[4]  The defense also introduced evidence

6  that Petitioner was a productive and hard worker in prison, and had artistic abilities.  Trial

7  counsel also pointed to Petitioner's confessions to the police and argued that the killings were

8  not premeditated, asserting that both were mitigating factors.

9          In aggravation, Petitioner's crime was extremely brutal; the double murder of his

10  neighbors, a mother and her two year old daughter, who he bludgeoned to death with a wrench

11  in the course of burglarizing their home, distributing the jewelry he obtained from the crime to

12  his sisters and other family members.  Moreover, despite Petitioner's contention in his statements

13  to police that the victims confronted him in their home when they arrived home early, and that

14  he only hit the victims in an attempt to get away, the prosecutor alleged that the attack was

15  intentional as both victims were half-dressed when found, and there was evidence that both had

16  been stuck while lying on the floor.  Additionally, Petitioner is a previously convicted felon

17  whose past crimes included two burglary convictions, a conviction for sexual assault, and a

18  conviction for assault with a deadly weapon.  The sexual assault victim was a physically

19  handicapped woman who was raped and sodomized at knifepoint after informing Petitioner about

20  her disability.  The victim in the assault with a deadly weapon was the sister of Petitioner's

21  friend, who he hit over the head with a vase and followed up by making unwanted and forceful

22  sexual advances.

23          The Court is not persuaded that the additional mitigation evidence could have either

24  _____

25  [4] At oral arguments, Petitioner alleged that trial counsel's portrayal of Petitioner as the "black
sheep" of a good family was at sharp odds with the reality of the family environment in which Petitioner
26  was raised.  Counsel asserted that the testimony of Petitioner's sisters and mother during the penalty
phase only reinforced that illusion, when the truth was that the family was replete with violent,
27  dysfunctional individuals.  However, the Court notes that Petitioner's own family members displayed a
great adherence to the law by turning in evidence to the police that was used against Petitioner at trial.
28  Several family members also testified against Petitioner in the guilt phase, and the Court is not persuaded
by Petitioner's characterization of the penalty phase presentation.

1   encouraged sympathy for Petitioner sufficient to sway the jury, nor could it have diminished the

2   aggravating evidence presented by the prosecution. In <u>Wiggins</u>, the Supreme Court agreed that

3   trial counsel's performance was prejudicially deficient, noting that not only did counsel fail to

4   present mitigating evidence during the penalty phase, but emphasized that the petitioner in that

5   case did not "have a record of violent conduct that could have been introduced by the state to

6   offset this powerful mitigating narrative." <u>Id.</u>, 539 U.S. at 537.  In contrast, Petitioner had a

7   substantial record of criminal conduct, including multiple instances of violent conduct against

8   women occurring years before the two brutal murders for which he stood trial, as Petitioner had

9   been previously convicted of multiple felonies, including several burglaries, a sexual assault, and

10  another assault with a sexual component.

11          Additionally, unlike in <u>Wiggins</u>, Petitioner's attorneys did present some social history

12  during the penalty phase, through the testimony of his mother and sisters, including Petitioner's

13  artistic abilities, and testimony of correctional officers on his productive and dependable work

14  habits in prison jobs. <u>Wiggins</u>, 539 U.S. at 515 (counsel introduced evidence that someone other

15  than the defendant committed the murder and talked of introducing information on the

16  petitioner's background during opening statements to the jury, but provided "no evidence of

17  Wiggins' life history" at the penalty phase).

18          Finally, the jury deliberations in Petitioner's case stand in stark contrast to numerous

19  other capital cases reviewed by the Ninth Circuit, where that Court used lengthy deliberations

20  as a factor in determining whether the introduction of mitigating evidence could have swayed

21  the jury's verdict.  In remanding another capital case for an evidentiary hearing, the Ninth

22  Circuit held that not only did trial counsel fail to investigate and present the petitioner's social

23  and mental health history to the jury, but specifically noted as evidence of prejudice that "several

24  jurors had voted for life on the first vote" and the jury sent a question to the trial court on the

25  meaning of life without parole prior. <u>Stankewitz v. Woodford</u>, 365 F.3d 706, 724-25 (9th Cir.

26  2004).  In <u>Silva v. Woodford</u>, the Court noted the jury sent multiple notes to the trial court

27  during their deliberations and one juror later recalled that some jurors had initially leaned

28  towards a sentence of life without the possibility of parole, which the Ninth Circuit used as

-38-                                    00cv2118

1  evidence that the case was close and petitioner was prejudiced by trial counsel's failure to

2  investigate and present mitigating evidence. <u>Silva</u>, 279 F.3d 825, 849-50 (9th Cir. 2002).

3      In <u>Karis v. Calderon</u>, the Ninth Circuit found that counsel rendered deficient

4  performance that warranted habeas relief where the defendant's trial attorney failed to present

5  mitigating evidence of substantial childhood abuse, instead basing his penalty phase presentation

6  almost solely on the defendant's artistic ability and academic potential when faced with evidence

7  in aggravation that included multiple past rapes and the double murder for which he was

8  sentenced to death. <u>Karis</u>, 283 F.3d at 1139-40. The Ninth Circuit emphasized as "noteworthy

9  that even with the weak mitigation evidence that was presented, the jury was out for three days

10  before rendering its verdict" in finding a reasonable probability that the introduction of the

11  evidence of child abuse would have produced a different result, and granted that petition. <u>Id.</u>

12  at 1140-41.

13      Conversely, in Petitioner's case, after the conclusion of the guilt phase, the jury reached

14  a guilty verdict after less than forty-five minutes of deliberations. Moreover, the jury determined

15  that Petitioner's case warranted a verdict of death after less than an hour and a half of penalty

16  phase deliberations. Thus, the jury's sum total of deliberations at guilt and penalty phase was

17  approximately two hours. Petitioner's jury did not engage in any extensive deliberations prior

18  to the penalty phase verdict, which leads the Court to surmise that, unlike in <u>Silva</u>, Petitioner's

19  jury considered the death penalty "a foregone conclusion." <u>Silva</u>, 279 F.3d at 849-50. Even if

20  the jury been presented with the mitigation evidence regarding Petitioner's background and

21  upbringing, the Court is not convinced there is a reasonable probability that one of the jurors

22  would have struck a different balance between life and death. <u>See</u> <u>Wiggins</u>, 539 U.S. at 535.

23  The state supreme court's similar conclusion was not objectively unreasonable.

24      In sum, the Court holds that the California Supreme Court's adjudication of the penalty

25  phase aspect of Petitioner's ineffective assistance of counsel claim did not involve an

26  unreasonable application of federal law, nor was it based on an unreasonable determination of

27  the facts. <u>Williams</u>, 529 U.S. at 412-13. In sum, the Court finds Petitioner is not entitled to

28  habeas relief on the entirety of claim 1.

D.     Evidentiary Hearing

The Ninth Circuit has held that when presented with a motion for an evidentiary hearing, a district court "must determine whether a factual basis exists in the record to support the petitioner's claim." Baja v. Ducharme, 187 F.3d 1075, 1078 (9th Cir. 1999). Generally, a petitioner is entitled to an evidentiary hearing if he or she is able to establish a colorable claim for relief, did not fail to develop the facts surrounding his or her claim, and was never given a state hearing on the claim. Insyxiengmay, 403 F.3d at 670 (quoting Baja, 187 F.3d at 1078). To establish a colorable claim, Petitioner is "required to allege specific facts which, if true, would entitle him to relief." Ortiz v. Stewart, 149 F.3d 923, 934 (9th Cir. 1998).

As Mr. Marrinan concedes that counsel did not have a tactical reason for failing to investigate and present the mitigation evidence, Petitioner does not warrant an evidentiary hearing on the performance prong. See Hendricks v. Vasquez, 974 F.2d 1099, 1109 (9th Cir. 1992) (an evidentiary hearing is appropriate where it is not possible to determine whether trial counsel's failure to investigate was a strategic decision). The Court must therefore determine whether an evidentiary hearing is warranted on the prejudice prong of claim 1. As the Court held there was no failure to develop the claim in state court, and Petitioner was never afforded an evidentiary hearing in state court, the Court "must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." Landrigan, 550 U.S. 465, 127 S.Ct. at 1940.

In a case where a petitioner had not received an evidentiary hearing in state court, and the federal court affirmed the denial of relief on procedural grounds, the Ninth Circuit stated because the claim had not been fully litigated on the merits, that:

> [w]ithout the benefit of an evidentiary hearing, it is impossible to evaluate the strength of Hoffman's defense at trial and sentencing. Therefore, we cannot conclude as a matter of law that there is no reasonable possibility that offering expert testimony and a thorough history of Hoffman's educational, medical, and psychological problems at the time of the murder might have reduced the likelihood that the death penalty would have been imposed. We therefore remand for an evidentiary hearing to develop a factual record regarding Hoffman's ineffective assistance of counsel claims. (citations omitted)

Hoffman v. Arave, 236 F.3d 523, 536 (9th Cir. 2001).

00cv2118

1   Here, the Court has engaged in an extensive review of the merits of Petitioner's claim

2   based on the briefs and exhibits, heard from both parties at oral arguments and concludes that

3   there is no reasonable probability that, provided with the mitigation evidence now presented to

4   the Court, the jury could have arrived at a different result. See Wiggins, 539 U.S. at 535.  As

5   Petitioner has not demonstrated that these allegations, if true, would entitle him to habeas relief,

6   an evidentiary hearing on this claim is not warranted.  See United States v. Birtle, 792 F.2d 846,

7   850 (9th Cir. 1986) (an evidentiary hearing is not required if the "motion and the files and

8   records of the case conclusively show that the prisoner is entitled to no relief.")

9   **2.   Claim 2 - Excusal of Jurors Who Did Not Favor Capital Punishment**

10   Claim 2 alleges that the trial court's improper dismissal for cause of five prospective jurors

11   (Francis Pilkington, Vincent Guerrero, Zina Hines, John Speights, and Larry Logan) who had

12   reservations about the death penalty violated his right to a fair and impartial jury under the Sixth

13   and Fourteenth Amendments.  (Pet. at 78-84.)

14   A.   State Supreme Court Ruling

15   The California Supreme Court considered and rejected this claim on direct appeal, ruling

16   as follows:

17   > With regard to defendant's claim that the trial court erred in excusing for cause
> prospective jurors who exhibited anti-death-penalty views, the standard governing our
18   > review of such a claim is whether exclusion was necessary because the juror's views
> concerning capital punishment would " 'prevent or substantially impair the performance
19   > of his [or her] duties as a juror ....' " (*Wainwright v. Witt* (1985) 469 U.S. 412, 424 [105
> S.Ct. 844, 852, 83 L.Ed.2d 841]; *People v. Wash* (1993) 6 Cal.4th 215, 254 [24
20   > Cal.Rptr.2d 421, 861 P.2d 1107].) When a juror's views are conflicting or ambiguous, the
> trial court's determination as to his or her state of mind generally is binding on a
21   > reviewing court. When there is no inconsistency, but simply a question whether the
> juror's responses demonstrated a bias for or against the death penalty, the trial court's
22   > judgment will not be set aside if supported by substantial evidence. (*People v. Wash, supra,*
> 6 Cal.4th at p. 254; *People v. Cooper* (1991) 53 Cal.3d 771, 809 [281 Cal.Rptr. 90, 809
23   > P.2d 865].)

24   > We conclude the record supports the trial court's determination that each of the
> prospective jurors in question (Francis Pilkington, Vincent Guerrero, Zina Hines, John
25   > Speights, and Larry Logan) harbored views unfavorable toward the death penalty that
> substantially impaired their ability to sit as jurors. Although Pilkington stated he did not
26   > believe he would vote automatically against the death penalty, upon further questioning
> he stated variously that he would be "unwilling to send anyone to death," and "would be
27   > very reluctant to vote for the death penalty in certain terms."

28   > Vincent Guerrero indicated that he "generally" did not believe in the death penalty,

-41-

although it probably was necessary and appropriate for certain crimes. He volunteered that he had refused to undergo a physical examination required for military service during the Korean War, in part because he did not want to kill anyone, and that he did not "really believe someone should be killed or executed," although there might be appropriate circumstances. Guerrero also disclosed that his son had died of kidney failure one year earlier, a circumstance that might make it difficult for him to render a verdict of death, and confirmed that the prosecution might not have a "fair shot" with him.

Zina Hines stated she did not believe she should be required to choose between life imprisonment and death because "I don't ... have that right." Although when asked by defense counsel whether she would vote automatically for a life sentence. she responded "No," that she would "go by the law," and that she would keep an open mind, she reiterated upon questioning by the prosecution that she was against the death penalty because she felt no one had the right to take another person's life, and admitted she did not want to be in that position. Excusing the juror, the trial court observed, "She was almost categorically disqualified from her initial answers, but there was a little glimmer of light, so that I let defense counsel rehabilitate her to some extent. [¶] But the net picture from her demeanor, as well as her words, is that she would find it nearly impossible to conceive of imposing the death penalty on someone."

When questioned during the death qualification portion of the voir dire, John Speights stated his personal belief that the death penalty was "inherently wrong," and that although he felt he could follow the law in determining the penalty, he was not certain he could do so. He also stated if he were on the jury and a verdict of death were returned, he did not know whether he could face defendant when the jury was polled to confirm that he had voted for death. The trial court denied the prosecution's challenge for cause at this point, stating that the juror had exhibited a reluctance to make difficult decisions rather than an opposition to the death penalty.

When examined again during general voir dire, however, Speights indicated that upon further reflection since his earlier questioning, he had become "really nervous about the death penalty issue" and did not believe he could set aside his personal views on the death penalty. In excusing Speights for cause, the court noted its view that the basis for doing so was "compelling now that there is substantial impairment, in view of his agonizing over it."

Larry Logan stated that "in most places I think I would not vote [for the] death penalty," and when asked whether there could be a case that was so overwhelming against a defendant that he would be able to vote for death, he stated that it was possible, but that "I don't think that I-I would say no."

***

For the foregoing reasons, there is no merit in defendant's claim that he was denied a fair and impartial jury as a result of the jury-selection process.

Samayoa, 15 Cal. 4th at 821-824.

Petitioner also raised allegations of trial court error in granting challenges for cause against these five prospective jurors as part of a broad trial court error claim, numbered as claim X, in the first state habeas petition. The California Supreme Court denied this claim, stating in full:

Claim X is denied on the merits, and except to the extent it asserts ineffective assistance

of trial counsel, and except to the extent it asserts that the trial court erred in failing to grant a continuance, it is also denied under Waltreus, supra, 62 Cal.2d 218, 225.

(Doc. No. 69; Lodgment No. 4.)

B.      Procedural Bar

As discussed above in Section III, supra, Waltreus does not bar federal review of this claim.

C.      Discussion

The United States Supreme Court has held that a sentence of death cannot be upheld if the jury that imposed or recommended it excluded prospective venirepersons who expressed opinions against the death penalty, but remain willing to follow the law as instructed by the trial court. Witherspoon v. Illinois, 391 U.S. 510, 522-23 (1968). In 1980, the Supreme Court additionally held that "a juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Adams v. Texas, 448 U.S. 38, 45 (1980). The Court later affirmed that the Adams standard was the proper standard by which to evaluate allegations of improper exclusion of prospective jurors. Wainwright v. Witt, 469 U.S. 412, 423 (1985).

Appellate review of a trial court's decision regarding issues arising from juror voir dire is obligatorily deferential, as a "reviewing court, which analyzes only the transcripts from voir dire, is not as well-positioned as the trial court to make credibility determinations." Miller-El v. Cockrell, 537 U.S. 322, 339 (2003). In the instant claim, Petitioner contends that the trial court improperly dismissed five prospective jurors for cause due to their views on capital punishment, alleging that although these individuals disfavored the death penalty, none held views that would have substantially impaired their ability to serve as jurors in Petitioner's case. (Pet. at 78.) To succeed on the merits, Petitioner must demonstrate that the state supreme court made an unreasonable determination of facts or applied the law in an unreasonable manner in rejecting this claim on appeal. Williams, 529 U.S. at 412-13.

Throughout his juror interview, Francis Pilkington repeatedly stated that it "would be very

1   difficult" and that he "would be very reluctant" to vote for the death penalty.  (RT 1974-77.)

2   Mr. Pilkington expressed serious concerns that a death penalty judgment was "so final and so

3   ultimate," and repeatedly expressed a concern that mistakes could occur.  (RT 1978.)  When

4   the prosecutor asked Mr. Pilkington if the government had a fair shot in the juror's mind to

5   convince him that the offense deserved the death penalty, Mr. Pilkington replied, "Probably no.

6   I don't know."  (RT 1982.)  Upon further questioning, Mr. Pilkington repeated again how

7   reluctant he was to consider voting for a potential death sentence, and averred that he would

8   "99.9 percent rather not" impose it.  (Id.)  Mr. Pilkington then twice stated "I would be unwilling

9   to send anyone to death."  (RT 1982-83.)  After argument by both counsel, the trial court found

10  him substantially impaired, and allowed the challenge for cause.  (RT 1984-85.)

11          Prospective juror Vincent Guerrero told the court and counsel that his vote would be

12  determined by "the circumstances" of the case.  (RT 2318.)  Mr. Guerrero was asked if he would

13  have the death penalty if he was in charge of his own state, to which he replied, "I would assume

14  yes, I probably would...because sometimes it is necessary to have the death penalty."  (RT 2320.)

15  However, in his jury questionnaire, counsel noted that Mr. Guerrero wrote he generally did not

16  believe in the death penalty.  (RT 2320-21.)

17          Mr. Guerrero stated that he had refused to take a physical during the Korean War

18  because "I did not want to go and kill anyone," and added that "I do not really believe someone

19  should be killed or executed or whatever."  (RT 2322.)  Mr. Guerrero then stated that he "did

20  not want to be sitting on it [Petitioner's trial]" and "I just don't want to be responsible for

21  whatever may happen."  (RT 2323.)  When the prosecutor asked if he had a fair shot in

22  convincing him to vote for the death penalty if it came to such a choice, Mr. Guerrero answered

23  "No, you do not."  (RT 2324.)  The prosecutor then asked if it would be "darn near impossible"

24  to convince him that the crime deserved a vote for the death penalty, to which Mr. Guerrero

25  responded, " I would assume so."  (Id.)  After argument, the court dismissed Mr. Guerrero for

26  cause "on the grounds of the juror's written response to question no. 103, and also his overall

27  pattern of answers and his demeanor and response to questions here in court."  (RT 2325-26.)

28          When the court asked prospective juror Zina Hines if she would refuse to consider life in

-44-                                                    00cv2118

prison as a potential punishment if defendant were found guilty, she replied, "No, I think I would take the option of life imprisonment.  I don't really believe in the death penalty." (RT 2486.) Ms. Hines added, "I don't feel I have the right to, you know, I don't feel I have the right to take someone's life or judge someone to take their life." (Id.)  When Ms. Hines was pressed on whether she would be able to vote for the death penalty, she repeated "I don't think I would do it.  I don't– don't have that right." (RT 2487.)

However, Ms. Hines said she was willing to follow the law as instructed and was open to the possibility of considering imposing the death penalty.  (RT 2490-91.)  When the prosecutor asked additional questions, Ms. Hines admitted that although her personal feelings were against the death penalty, she would follow the law.  (RT 2492.)  The prosecutor then noted that in her questionnaire, she wrote, "I don't feel they [the death penalty] should be used at all."  (RT 2493.)  The court granted the prosecutor's challenge for cause, concluding that "I believe that this is a case of substantial impairment in her ability to follow the law.  She was almost categorically disqualified from her initial answers, but there was a little glimmer of light, so that I let defense counsel rehabilitate her to some extent....But the net picture from her demeanor, as well as her words, is that she would find it nearly impossible to conceive of imposing the death penalty on someone." (RT 2495.)

Prospective juror John Speights initially stated that "as far as the death penalty issue, I don't know that I could stand in judgment of someone else in that case," adding "[i]t's just I don't feel that any human has the right to judge that someone else should be killed." (RT 1412.) However, Mr. Speights then claimed he could do his duty as a juror and follow the law.  (RT 1415.)  Mr. Speights later assured the prosecutor that the government had a fair chance with him as a juror.  (RT 1421.)  The court denied the prosecution's challenge for cause, stating "This is a man– I think his answers are explainable by his apparent reluctance to make hard decisions, but I don't think that reluctance is tied to his opposition to the death penalty so much as it is a trait of character, and it is sort of a mirror image of one or two of the pro-death penalty people that we have left on earlier..." (RT 1425.)

A few weeks later, Mr. Speights returned to state that "I am really nervous about this

-45-                                    00cv2118

1  death penalty issue, and I am not so sure I can vote for it." (RT 2790.) Mr. Speights added that
2  "before I was unsure, thinking that I probably could go ahead and vote that way, and just over
3  the last two weeks I guess I've thought about it a lot. It's bothering me a lot, and I just think
4  now I am leaning more towards the other way; that I just– you know, I don't think I could do
5  it." (RT 2801.) Mr. Speights also said his earlier opinion had not changed, "just my feelings
6  about whether or not I could vote that way." (RT 2802.) When asked if he would refuse to
7  follow the law regarding the imposition of the death penalty, Mr. Speights replied, "I don't think
8  I can answer that for sure one way or the other." (RT 2803.) Defense counsel then inquired
9  whether he could leave his mind open to the possibility of the death penalty, Mr. Speights
10 initially wavered, but then answered, "I don't think so." (RT 2804.) After this inquiry, the court
11 granted a challenge for cause, stating, "He was a marginal--a challenge was made and denied on
12 the 15th, but I think the case is compelling now that there is substantial impairment, in view of
13 his agonizing over it." (RT 2805.)

14      Larry Logan informed the court, "[w]ell, that I have a little problem with, myself voting
15 for death penalty. There may be some circumstances that I might vote for the death penalty, but
16 I in most places I think I would not vote death penalty. Now, that's the way I feel now." (RT
17 2146.) Mr. Logan elaborated, stating, "[w]ell, I have problems with it. Well, personally I don't
18 think that life for life. I just don't--I never have been able to be convinced that life for life is
19 justifiable." (Id.) Mr. Logan did concede that "[i]t might be some case that I might change that
20 would--I would vote for death penalty. But now without hearing, though, I don't think that I--I
21 would say no." (RT 2147.)

22      When asked if he could stay open to considering the death penalty as a potential
23 punishment, Mr. Logan replied "Well, I think I'd leave my mind open but I--I'm still having
24 reservations about the death penalty." (RT 2148.) Mr. Logan then stated, "Yeah, I could deal
25 with an open mind, but sitting here now, I'm just feeling that my mind would be practically made
26 up without hearing the evidence," and concluded that "I think I would vote to probably life
27 without parole." (RT 2152.) The trial court allowed the challenge for cause, and concluded
28 that "[i]t was apparent from his demeanor that the very thought of imposing the death penalty

1   was painful to him and I think his words confirmed that state of mind that he could not really

2   visualize any state of facts that would warrant a penalty of anything other than life in prison

3   without parole." (RT 2155.)

4       The Supreme Court has stated that in conducting juror interviews,

5       [M]any veniremen simply cannot be asked enough questions to reach the point
        where their bias has been made "unmistakably clear"; these veniremen may not
6       know how they will react when faced with imposing the death sentence, or may
        be unable to articulate, or may wish to hide their true feelings. Despite this lack
7       of clarity in the printed record, however, there will be situations where the trial
        judge is left with the definite impression that a prospective juror would be unable
8       to faithfully and impartially apply the law. For reasons that will be developed more
        fully *infra*, this is why deference must be paid to the trial judge who sees and hears
9       the juror.

10  Witt, 469 U.S. at 425-26 (footnote omitted).

11      The Supreme Court has opined that a trial judge's "power of observation often proves the

12  most accurate means of ascertaining the truth." Id. at 434. Contrary to Petitioner's assertions,

13  the foregoing examination of the record provides substantial support for the conclusions reached

14  by both the trial court and the state supreme court in determining that these prospective jurors

15  were "substantially impaired" in their ability to perform as jurors due to their views on the death

16  penalty. Id. at 433.

17      The California Supreme Court's determination that the trial judge did not commit error

18  in excusing the five prospective jurors was not contrary to or an unreasonable application of

19  federal law, nor was it based on an unreasonable determination of the facts. Williams, 529 U.S.

20  at 412-13. Petitioner is not entitled to habeas relief on this claim.

21  **3.    Introduction of Raymond Testimony During Penalty Phase**

22      Claim 3 alleges that the admission of the preliminary hearing testimony of witness Berta

23  Lou Raymond at the penalty phase violated Petitioner's Sixth Amendment right to confront

24  witnesses against him and Eighth Amendment right against cruel and unusual punishment. (Pet.

25  at 94-101.)

26      A.    State Court Decision

27      The California Supreme Court considered and rejected this claim on direct appeal,

28  reasoning as follows:

-47-

At the commencement of the penalty phase, the prosecution moved for admission of the 1976 preliminary hearing testimony of Berta Lou Raymond to prove the circumstances surrounding defendant's 1976 conviction for rape and burglary, including the unadjudicated crime of sodomy. [FN10]

> FN10 Following the preliminary hearing in that proceeding, defendant pleaded guilty to the charges of burglary and rape.

At the time of the present trial, Raymond was deceased, and the prosecution sought to admit her preliminary hearing testimony on the ground she was unavailable as a witness under Evidence Code section 1291.

Defense counsel objected to the admission of Raymond's prior testimony on the ground that such evidence was the equivalent of "conditional testimony" under Penal Code section 1335, and therefore was inadmissible in a capital case. He also argued that defendant's objective in cross-examining Raymond at the preliminary hearing was dissimilar from his objective at the penalty phase of the trial in the present case, and therefore the preliminary hearing testimony was inadmissible under Evidence Code section 1291. The trial court overruled these defense objections, indicating the requisite reliability for the admission of hearsay evidence was present, and noting that at the preliminary hearing the victim had testified in open court under oath with knowledge that she was subject to prosecution for perjury and "subject to cross-examination by counsel who had every motive and inducement to break down her testimony or break her credibility."

Defendant now contends the admission of Raymond's preliminary hearing testimony violated Evidence Code section 1291, as well as his right of confrontation under the state and federal Constitutions.

Evidence Code section 1291, subdivision (a), provides: "Evidence of former testimony is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and: [¶] ... [¶] (2) The party against whom the former testimony is offered was a party to the action or proceeding in which the testimony was given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing."

In *People v. Zapien*, supra, 4 Cal.4th 929, 975, this court recognized that the "[a]dmission of the former testimony of an unavailable witness is permitted under Evidence Code section 1291 and does not offend the confrontation clauses of the federal or state Constitutions-not because the opportunity to cross-examine the witness at the preliminary hearing is considered an exact substitute for the right of confrontation at trial [citation], but because the interests of justice are deemed served by a balancing of the defendant's right to effective cross-examination against the public's interest in effective prosecution." The court further determined that a defendant's motive in cross-examining a witness at a preliminary hearing may differ somewhat from the motive at trial, but nevertheless the earlier testimony may be admissible at the trial under section 1291 because the "motives need not be identical, only 'similar.'" (*People v. Zapien*, supra, 4 Cal.4th at p. 975, citing *People v. Alcala* (1992) 4 Cal.4th 742, 784 [15 Cal.Rptr.2d 432, 842 P.2d 1192].) Following similar reasoning and principles, in *People v. Wharton* (1991) 53 Cal.3d 522 [280 Cal.Rptr. 631, 809 P.2d 290] the court held the defendant's interest and motive in cross-examining the alleged rape victim at the preliminary hearing in a prior unrelated criminal prosecution was sufficiently similar to the defendant's interest and motive at the penalty phase of a subsequent capital trial to warrant the admission of the preliminary hearing testimony under Evidence Code section 1291. (53 Cal.3d at p. 589.)

Defendant's motive and interest in cross-examining Raymond at the 1976 preliminary hearing were closely similar to defendant's objectives at the penalty phase of the trial in the present capital case-namely, to attempt to discredit the witness's account of the crime and establish that the witness could not identify the person or persons who committed the rape and burglary, while at the same time, in light of the witness's sympathetic circumstances, not offending or alienating the trier of fact by treating the witness harshly. The record indicates defense counsel at the preliminary hearing acted reasonably in light of these objectives, establishing that the witness was unable to see the face of the rapist and had only a general idea as to the rapist's height and build.

Defendant argues that his motive and interest in cross-examining Raymond at the penalty phase of the present capital trial-namely, to elicit evidence of mitigating circumstances that would tend to diminish the aggravating nature of the crimes-was dissimilar from his motive and interest at the preliminary hearing in the rape and burglary prosecution. Defendant fails to suggest, however, the evidence that might have been elicited from Raymond (had she testified at the penalty phase of the present capital case) but was not elicited at the preliminary hearing, and that would have placed defendant's conduct (raping and sodomizing a known multiple sclerosis victim) in a less aggravating light.

For all of these reasons, we conclude the trial court properly concluded that defendant's "motive and interest" in cross-examining Raymond at the preliminary hearing and at the capital trial were sufficiently similar to satisfy the requirements of Evidence Code section 1291.

Defendant additionally claims the admission of Raymond's preliminary hearing testimony violated his federal constitutional right of confrontation because defense counsel rendered incompetent representation at the preliminary hearing by eliciting from the witness damaging information instead of contesting the reliability of the witness's perceptions (including the number of men who raped her). Defendant failed to raise this claim below, however, and accordingly has waived the claim on appeal. Moreover, as the court explained in *People v. Zapien, supra,* 4 Cal.4th 929, as long as a defendant was provided the *opportunity* for cross-examination, the admission of preliminary hearing testimony under Evidence Code section 1291 does not offend the confrontation clause of the federal Constitution simply because the defendant did not conduct a particular form of cross-examination that in hindsight might have been more effective. (See *People v. Zapien, supra,* 4 Cal.4th at p. 975.)

Defendant further contends the presumption of reliability that normally is accorded preliminary hearing testimony (*California v. Green* (1970) 399 U.S. 149, 161-162 [90 S.Ct. 1930, 1936-1937, 26 L.Ed.2d 489]) should not apply in the present case, because Raymond's testimony was demonstrated to be in fact unreliable in light of the penalty phase testimony of David Anderson relating that he and the third burglar also had raped the victim.

In *California v. Green, supra,* 399 U.S. 149, however, the United States Supreme Court made clear that when a defendant has had an opportunity to cross-examine a witness at the time of his or her prior testimony, that testimony is deemed sufficiently reliable to satisfy the confrontation requirement (*id.* at pp. 166-167 [90 S.Ct. at pp. 1939-1940]), regardless whether subsequent circumstances bring into question the accuracy or the completeness of the earlier testimony. (*Id.* at p. 167, fn. 16 [90 S.Ct. at p. 1940].) "[T]he 'reliability' of the statement is based on the circumstances under which it was given ...." (*Ibid.*)

Finally, we reject defendant's contention that the admission of the preliminary hearing testimony was the equivalent of the admission of deposition testimony given at a

-49-

"conditional examination" in violation of section 1335, which authorizes the People in noncapital cases to have witnesses conditionally examined. [FN11] The preliminary hearing at which Raymond testified was not a conditional examination within the meaning of section 1335, and that statute therefore has no application to the present case.

> FN11 Section 1335, subdivision (a), provides: "When a defendant has been charged with a public offense triable in any court, he or she in all cases, *and the people in cases other than those for which the punishment may be death*, may, if the defendant has been fully informed of his or her right to counsel as provided by law, have witnesses examined conditionally in his or her or their behalf, as prescribed in this chapter." (Italics added.)

Samayoa, 15 Cal. 4th at 849-852.

B.    Exhaustion

Petitioner argues the preliminary hearing testimony should not have been read to the jury because "capital sentencing procedures require a far greater degree of reliability and scrutiny than non-capital cases" and Petitioner's conviction and sentence are therefore in violation of the Eighth Amendment. (Pet. at 101.) Respondent contends the Eighth Amendment aspect of the claim is unexhausted but the claim should nonetheless be denied on the merits. (Ans. at 42.) Petitioner maintains "[t]here is but one issue; whether the intent and motivation for cross-examination at a preliminary hearing that had absolutely nothing to do with penalty, let alone the imposition of the death penalty under the specific statutory formula of California, was the same as petitioner's motive and intent at the penalty phase of his death penalty trial that took place 12 years later." (Traverse at 34.)

In order to satisfy the exhaustion requirement, a petitioner must first provide the state courts with a "'fair opportunity' to apply controlling legal principles to the facts bearing upon his [or her] constitutional claim." Anderson v. Harless, 459 U.S. 4, 6 (1982) (quoting Picard v. Connor, 404 U.S. 270, 276-77 (1971)). Upon review, the Court finds that Petitioner did raise the Eighth Amendment aspect of the claim in the California Supreme Court. On direct appeal to the California Supreme Court, Petitioner's claim included the assertion that "[t]he trial court's refusal to exclude the Raymond transcript eviscerated appellant's rights to confrontation, due process, and to a reliable sentencing determination." (Appellant's Opening Brief on Direct Appeal ["AOB"] at 137.) Earlier in the direct appeal, Petitioner specifically asserted that the "[a]dmission of the prior testimony violated the Eighth Amendment mandate of heightened

-50-

1   reliability in capital judgments." (Id. at 126.)  In the heading to that same claim, Petitioner

2   asserted "The Use Of The Preliminary Hearing Testimony To Prove The Prior Charged Crimes

3   And The Uncharged Sodomy Denied Appellant His Federal Due Process, Confrontation, And

4   Eighth Amendment Rights Because The Evidence Was Shown To Be Actually Unreliable." (Id.)

5          The exhaustion requirement is satisfied once the "substance of the claim has been fairly

6   presented" to the state's highest court. Duncan v. Henry, 513 U.S. 364, 367 (1995); Vasquez

7   v. Hillary, 474 U.S. 254, 257 (1986).  A petitioner can develop additional facts supporting a

8   particular claim on federal habeas as long as the factual and legal basis of that claim was

9   previously presented to the state court. Moorman v. Schriro, 426 F.3d 1044, 1056 (9th Cir.

10  2005).  Although the Confrontation Clause was undoubtedly the centerpiece of Petitioner's

11  argument to the state court, the Eighth Amendment aspect was fairly presented to the California

12  Supreme Court.  Thus, the Court rejects Respondent's exhaustion argument.

13         C.      Merits

14         The Confrontation Clause of the Sixth Amendment provides that in criminal cases the

15  accused has the right to "be confronted with witnesses against him." U.S. Const. amend. VI.

16  The right to confrontation applies to the states through the Fourteenth Amendment. See

17  Pointer v. Texas, 380 U.S. 400, 403 (1965).  The ultimate aim of the Confrontation Clause is

18  to ensure the reliability of evidence, but the guarantee is procedural rather than substantive and

19  therefore dictates not that evidence be reliable, but that reliability is assessed by the mechanism

20  of cross-examination. See Crawford v. Washington, 541 U.S. 36, 61 (2004); see also Davis v.

21  Alaska, 415 U.S. 308, 315 (1974).

22         Pursuant to Crawford, "[t]estimonial statements of witnesses absent from trial have been

23  admitted only where the declarant is unavailable, and only where the defendant has had a prior

24  opportunity to cross-examine." Id., 541 U.S. at 59. A defendant's opportunity to cross-examine

25  a witness is satisfied when the cross-examination occurs under circumstances "closely

26  approximating those that surround a typical trial." California v. Green, 399 U.S. 149, 165

27  (1970).

28         In the instant claim, Petitioner concedes that Raymond was unavailable to testify during

-51-                                          00cv2118

1    the penalty phase of his trial (she was deceased) and acknowledges that defense counsel did have

2    a prior opportunity to cross-examine the witness at the preliminary hearing. Petitioner's only

3    assertion is that the prior opportunity was insufficient because defense counsel did not have a

4    similar motive to cross-examine witness Raymond at the preliminary hearing on the rape charge

5    in 1976 as he did during the penalty phase of a capital murder trial in 1988, and the trial court's

6    admission of the preliminary hearing testimony violated Petitioner's constitutional rights. (Pet.

7    at 97.)

8        The California Evidence Code, section 1291, provides "(a) Evidence of former testimony

9    is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and ...

10   (2) [t]he party against whom the testimony is offered ... had the right and opportunity to cross-

11   examine the declarant with an interest and motive similar to that which he has at the hearing."

12       However, "similar motive" is a state evidentiary requirement, and not a requirement

13   under the Confrontation Clause. The Supreme Court has refrained from conducting any similar

14   motive inquiry in their Sixth Amendment cases, and Petitioner has not directed the Court's

15   attention to any clearly established federal law that supports his position. See Green, 399 U.S.

16   149; see also Barber v. Page, 390 U.S. 719, 725-26 (1968). The Supreme Court has held that

17   a witness' prior testimony is properly admitted at a criminal trial when the prosecutor is not at

18   fault for the witness' unavailability and the prior proceedings are not "significantly different from

19   an actual trial to warrant distinguishing the two cases for purposes of the Confrontation Clause."

20   Green, 399 U.S. at 165.

21       As cited approvingly in Green, Raymond's statement at the preliminary hearing had

22   already been given under circumstances closely approximating those that surround the typical

23   trial. For instance, Raymond was under oath during the proceedings, Petitioner was represented

24   by counsel and had every opportunity to cross-examine Raymond as to her statement. Moreover,

25   the preliminary hearing was conducted before a judge, and in surroundings that were equipped

26   to provide a judicial record of the proceedings. See id. at 165.

27       In support of the Eighth Amendment argument, Petitioner cites to Gilmore v. Taylor, 508

28   U.S. 333 (1993) and Herrera v. Collins, 506 U.S. 390 (1993). However, neither case supports

Petitioner's assertion that the trial court's admission of the Raymond preliminary hearing violated his constitutional rights because capital cases require a higher degree of reliability. In Gilmore, the Supreme Court did generally note that "the Eighth Amendment requires a greater degree of accuracy and factfinding than would be true in a non-capital case," but the Court never ruled the admission of preliminary hearing testimony in a capital penalty phase, such is at issue here, amounted to a constitutional violation. See id., 508 U.S. at 342; see also Herrera, 506 U.S. at 399. Petitioner has failed to cite any clearly established Supreme Court precedent that supports the claim he advances here, and the claim fails on the merits.

Federal district court review of Petitioner's claim is limited to an examination of whether the state court's adjudication of the claim was contrary to, or an unreasonable application of, clearly established federal law. Williams, 529 U.S. at 412-13. Petitioner has failed to demonstrate the state supreme court was objectively unreasonable in rejecting this claim on appeal. Petitioner does not warrant habeas relief on claim 3.

**4.     Claim 4 - Exculpatory Evidence on Credibility of Government Witness**

Petitioner alleges that the government violated his rights to a fair trial and protection from cruel and unusual punishment by failing to disclose material exculpatory evidence concerning the credibility of a penalty phase prosecution witness. (Pet. at 102-04.)

A.     California Supreme Court Decision

Petitioner presented this claim to the state court as Claim I of his Second Petition for Writ of Habeas Corpus. The California Supreme Court considered and rejected this claim, stating in full:

Claim I is denied on the merits.

(Doc. No 69; Lodgment 1.)

B.     Merits

In Brady v. Maryland, 373 U.S. 83 (1963), the United States Supreme Court held that the government must disclose all material evidence that is favorable to the defendant. A successful Brady claim requires three findings: (1) the prosecution suppressed evidence, (2) the evidence was favorable to the accused; and (3) the evidence was material to the issue of guilt or

1   punishment.  Id., 373 U.S. at 87.  Full compliance with Brady includes the disclosure of
2   "evidence that the defense might have used to impeach the Government's witnesses by showing
3   bias or interest." United States v. Bagley, 473 U.S. 667, 676 (1985).  Evidence is material if
4   "there is a reasonable probability that, had the evidence been disclosed to the defense, the result
5   of the proceeding would have been different." Kyles v. Whitley, 514 U.S. 419, 434 (1995).  A
6   "reasonable probability" is demonstrated when the failure to disclose evidence "undermines
7   confidence in the outcome of the trial." Id. (quoting Bagley, 473 U.S. at 678).

8        Petitioner alleges his rights were violated by the prosecution's failure to disclose the fact
9   that penalty phase witness James "Cowboy" Anderson had once been an informant for Detective
10  Jordan. (Pet. at 102.)  Mr. Anderson was a co-defendant in the Berta Lou Raymond rape and
11  burglary case, which was used as an aggravating factor in the penalty phase of Petitioner's trial.
12  Anderson testified at the penalty phase of Petitioner's trial, stating that he pled guilty to the
13  burglary of the home of Berta Lou Raymond.  (RT 4745.)  Anderson also testified as to the
14  details of Petitioner's rape of Mrs. Raymond. (RT 4737.)  During his penalty phase testimony,
15  Anderson admitted, for the first time, that he had also raped Mrs. Raymond during the burglary
16  but had previously blamed everything on Petitioner to avoid prosecution for rape.  (RT 4754-55,
17  4758.)

18       A letter from trial prosecutor Jeff Dusek to current counsel Glen Niemy, dated October
19  15, 2003, states that Dusek "was unable to locate any information that James 'Cowboy' Anderson
20  was an informant." (Ex. B-1 to Pet.)  Detective Ronald Jordan, one of the lead investigators on
21  Petitioner's case, signed a declaration dated January 27, 2002, stating, "Richard always left clues
22  or a trademark that would connect him to a crime.  He was arrested for the rape of a woman in
23  a wheelchair.  One of the other defendants on the case was an informant of mine.  His nickname
24  was 'Cowboy.'  When Cowboy got on the witness stand at trial, we discovered that he had been
25  involved in the rape with Richard.  We did not know this until Cowboy testified." (Ex. B-2 to
26  Pet.)  Handwritten onto the Jordan declaration were several additional phrases, stating, "Told
27  me he was involved in the break in.  Did not admit to also raping the victim until he testified at
28  trial." (Id.)

-54-

1    Federal habeas counsel Glen Niemy's declaration stated that it was through his

2    investigator's interview of Detective Jordan that Anderson's status as an informant was revealed;

3    Niemy also asserted there were no indications that defense counsel at trial knew the information.

4    (Ex. B-4 to Pet.)  Both of Petitioner's defense counsel at trial, Michael Marrinan and Michael

5    Popkins, signed declarations in which each attorney avers that "[a]t no time was I informed by

6    any representative of the government (prosecution, police or otherwise) that Mr. Anderson had

7    served as an informant for Detective Jordan." (Exs. B-5, B-6 to Pet.)

8        The Supreme Court and Ninth Circuits have long held the informant status of a

9    government witness falls within the scope of Brady.  See Banks v. Dretke, 540 U.S. 668 (2004);

10   Bagley v. Lumpkin, 798 F.2d 1297 (9th Cir. 1986); Singh v. Prunty, 142 F.3d 1157, 1164 (9th

11   Cir. 1998).  The Supreme Court explained that when a witness' testimony is central to the

12   government's case, their credibility is an "important issue in the case." Giglio v. United States,

13   405 U.S. 150, 155 (1972). Respondent argues that Anderson appears to have been an informant

14   in 1975, at the time of the rape case against Petitioner, and Anderson's testimony at Petitioner's

15   penalty phase was in 1988. (Ans. at 52.) Although Respondent evidently concedes Anderson's

16   status as an informant was suppressed from trial counsel, he asserts "[t]he fact that Anderson

17   had been a police informant was not favorable or material because it has been so long ago that

18   it was meaningless."  (Id.)  Respondent also maintains that Anderson's testimony was

19   unnecessary to convince the jury that Petitioner raped Mrs. Raymond, further negating the

20   materiality of his informant status.  (Id.)

21       The materiality of Anderson's testimony runs in contrast to a situation in which the

22   "government's case rested solely on the credibility" of the two witnesses at issue in the Brady

23   claim. Bagley, 798 F.2d at 1301. Anderson's testimony was merely cumulative to proving the

24   prior felony conviction.  The Raymond preliminary hearing testimony on the rape and burglary,

25   coupled with the defendant's plea of guilt to the crimes, were certainly sufficient evidence to

26   establish the truth of that prior conviction as an aggravating factor.

27       Furthermore, in a penalty phase closing argument that spanned twenty-five transcript

28   pages, the prosecutor made only a few brief mentions of Anderson.  After reciting a list of prior

-55-                                    00cv2118

1   crimes committed by Petitioner, the prosecutor stated that Anderson "says that Mr. Samayoa
2   needed some money to pay a fine from one of his earlier convictions," which was the motivation
3   behind the burglary of Mrs. Raymond's home. (RT 5002.) The prosecutor additionally stated
4   that Anderson testified "he [Petitioner] was going in there to rape somebody." (RT 5003.)

5          The prosecution's penalty phase presentation focused largely on the circumstances of the
6   crimes, Petitioner's prior felony convictions, and other criminal activity. The rape and burglary
7   convictions were part of the case, but Anderson cannot be considered a crucial penalty phase
8   witness. The prosecutor's arguments centered on the multiple murder circumstances of the
9   crime as well as the death of a young child. (RT 4993-94.) The prosecution also asserted that
10  "we are certain who killed these two people," and "we know we have the right person, because
11  he [Petitioner] told us." (RT 4996-97.) The 1976 burglary and rape convictions were only one
12  of three prior crimes resulting in convictions that the prosecution introduced during the penalty
13  phase, in addition to the introduction of other evidence of criminal activity involving the use of
14  force or violence.

15         The evidence that Anderson was a prior informant for Detective Jordan was not material,
16  as his testimony was in no way "crucial to the prosecution." Banks, 540 U.S. at 700. Even
17  without the evidence of Anderson's informant status, there was ample impeachment evidence
18  against Anderson presented at trial. Moreover, the aggravating evidence against Petitioner at
19  the penalty phase was overwhelming. Even without Anderson's testimony there does not exist
20  a reasonable probability of a more favorable outcome. The Supreme Court has explained "[t]he
21  question is not whether the defendant would more likely than not have received a different
22  verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial
23  resulting in a verdict worthy of confidence." Kyles, 514 U.S. at 434. Ultimately, Petitioner
24  presents the Court with no evidence that he was deprived of a fair trial. Moreover, Petitioner has
25  failed to present any argument or citation to authority that supports his allegation of an Eighth
26  Amendment violation due to the suppression of Anderson's status as an informant, and the
27  Court also rejects this aspect of his claim. Petitioner is not entitled to habeas relief on claim 4.
28         C.    Evidentiary Hearing

-56-                                              00cv2118

1   In the instant case, Petitioner has not provided the Court with sufficient factual support
2   for his conclusion that the evidence suppressed was material to the penalty phase determination
3   in his case.  The Ninth Circuit has previously noted that a habeas petitioner "is expected to state
4   facts that point to a real possibility of constitutional error."  Wacht v. Cardwell, 604 F.2d 1245,
5   1247 (9th Cir. 1979) (quoting Blackledge v. Allison, 431 U.S. 63, 75 n.7 (1977)).

6   Petitioner has failed to establish that Anderson's prior status as a police informant was
7   material to the outcome of his penalty phase proceeding.  Anderson was merely a cumulative
8   witness to the rape conviction aggravating factor.  In addition, the aggravating factors presented
9   in the penalty phase significantly outweighed the mitigation offered, and potential impeachment
10   of Anderson on his informant status could not "reasonably be taken to put the whole case in
11   such a different light as to undermine confidence in the verdict."  Kyles, 514 U.S. at 535.

12   A petitioner is entitled to an evidentiary hearing if he is able to establish a colorable claim
13   for relief, did not fail to develop the facts surrounding his claim, and was never given a state
14   hearing on the claim.  Insyxiengmay, 403 F.3d at 670 (quoting Baja, 187 F.3d at 1078).  To
15   establish a colorable claim, Petitioner is "required to allege specific facts which, if true, would
16   entitle him to relief."  Ortiz, 149 F.3d at 934.  As to the instant claim, Petitioner is unable to
17   establish a colorable claim for relief.  Accordingly, Petitioner is not entitled to an evidentiary
18   hearing on this claim.

19   **5.   Claim 5 - Refusal to Permit Cross-Examination and Denial of Pitchess Motion**

20   Petitioner claims the trial court's refusal to allow him to cross-examine the interrogating
21   detectives with past instances of dishonest or unprofessional behavior violated the confrontation
22   clause of the Sixth Amendment as well as his rights under the Eighth Amendment.  (Pet. at 105-
23   110.)  Petitioner also claims the trial court's denial of his Pitchess motion violated his federal
24   constitutional rights, including those guaranteed by the Confrontation Clause.  (Pet. at 110.)

25   A.   State Court Decision

26   This claim was raised and rejected on direct appeal, with the California Supreme Court
27   opining as follows:

28   Defendant challenges as error the trial court's refusal to disclose the personnel files of

-57-                                          00cv2118

Officers Jordan and Padillo and the restriction of counsel's cross-examination of these officers regarding complaints and disciplinary actions taken against them, asserting a violation of his right of confrontation, among other rights guaranteed by the federal Constitution. As we shall explain, following our independent examination of the personnel files in question, we conclude defendant's claims have no merit.

On November 7, 1986, in municipal court proceedings in the present case, the defense filed a motion for the discovery of the personnel files of Officers Jordan and Padillo pursuant to *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 [113 Cal.Rptr. 897, 522 P.2d 305] (see Evid. Code, § 1043),[FN5] based upon a newspaper article reporting incidents of misconduct involving these officers. According to the article, the asserted misconduct resulted in the officers' transfer out of the homicide unit of their department. Allegedly, the officers were reprimanded after they voluntarily gave up their seats on an overbooked airline flight in exchange for air travel coupons. The article also indicated that Officer Jordan previously had been found to have coerced the confession of a juvenile, James M., in an unrelated homicide investigation. The defense sought access to the officers' personnel files containing information pertaining to the officers' history on the ground these records were relevant to the officers' credibility and the determination as to whether defendant's initial confession had been coerced.

> FN5 Evidence Code section 1043 provides in part: "(a) In any case in which discovery or disclosure is sought of peace officer personnel records ..., the party seeking the discovery or disclosure shall file a written motion with the appropriate court .... [¶] (b) The motion shall include all of the following: [¶] ... [¶] (2) A description of the type of records or information sought. [¶] (3) Affidavits showing good cause for the discovery or disclosure sought, setting forth the materiality thereof to the subject matter involved in the pending litigation and stating upon reasonable belief that the governmental agency identified has the records or information from the records...."

Following an in camera review of the personnel files (Evid. Code, § 1045),[FN6] the magistrate ordered the release of a redacted copy of a complaint against Officer Jordan filed by a witness (a Mr. Legg) in another, unrelated homicide investigation. The magistrate ordered that all remaining materials be copied and sealed.

> FN6 Evidence Code section 1045 provides in part: "(a) Nothing in this article shall be construed to affect the right of access to records of complaints, or investigations of complaints, or discipline imposed as a result of such investigations, concerning an event or transaction in which the peace officer participated, or which he perceived, and pertaining to the manner in which he performed his duties, provided that such information is relevant to the subject matter involved in the pending litigation. [¶] (b) In determining relevance the court shall examine the information in chambers in conformity with Section 915, and shall exclude from disclosure: [¶] (1) Information consisting of complaints concerning conduct occurring more than five years before the event or transaction which is the subject of the litigation in aid of which discovery or disclosure is sought. [¶] (2) In any criminal proceeding the conclusions of any officer investigating a complaint filed pursuant to Section 832.5 of the Penal Code. [¶] (3) Facts sought to be disclosed which are so remote as to make disclosure of little or no practical benefit."

In the superior court, before the case was assigned to the trial judge, defendant sought review of the magistrate's ruling on the *Pitchess* motion by way of a motion to set aside

the information pursuant to section 995. At the hearing on the motion, Officers Jordan and Padillo testified that they had been transferred out of the homicide unit following an incident involving their relinquishment of seats on an overbooked airline flight, acceptance of air travel coupons in exchange, and application for overtime pay for the additional time they were required to spend in the airport waiting for a later flight. Following the hearing, the assigned judge (the Honorable Raul Rosado) reviewed in camera the personnel files of each officer and determined that the files contained nothing relevant to the case, with the exception of the previously disclosed complaint of Mr. Legg. The court accordingly upheld the magistrate's ruling on the *Pitchess* motion. The Court of Appeal subsequently denied defendant's petition for writ of mandate, concluding there was no showing of an abuse of discretion with respect to the ruling on the *Pitchess* motion.

On January 28, 1988, defendant renewed his motion in the superior court, seeking the production of any documents contained in the San Diego Police Department personnel files of Officers Jordan and Padillo that pertained to instances of improper conduct involving these officers, including false arrest, illegal search and seizure, fabrication of charges or evidence, improper techniques employed in obtaining admissions or confessions, failure to give *Miranda* advisements, inadequate or improper *Miranda* advisements, the use of physical force or psychological coercion in obtaining statements or confessions, or improper tactics in making arrests or obtaining confessions. [FN7] In support of the motion, defense counsel submitted a declaration stating "upon information and belief" that during their initial interrogation of defendant, Officers Jordan and Padillo lied to defendant, ignored his request for an attorney, and induced him to confess by telling him "that things would look better or go easier if he answered questions or admitted crimes." Counsel also stated that defendant did not knowingly or intelligently waive his *Miranda* rights, and claimed that the files might contain information relevant to whether defendant had been coerced physically or psychologically to waive his rights and confess.

> FN7 Defendant also sought personnel records pertaining to investigations or disciplinary actions involving the officers for "any acts or omissions of dishonesty, violations of law or departmental policy, violations of trust placed in them by superiors in the department or any other improper act committed while a member of the homicide unit or other detective division which may reflect on the officers' character for honesty or credibility, their custom or habit for following the law and/or departmental rules and regulations in their training and experience investigating crimes, arresting and handling witnesses and suspects, interrogating or interviewing witnesses and/or suspects."

The trial judge (the Honorable Douglas R. Woodworth) conducted an in camera review of the officers' complete personnel files. In the course of its review (attended by a deputy city attorney), the court noted on the record the previous disclosure of the airline coupon incident. The deputy city attorney disclosed that one of the officers had been accused of the theft of a "scanner" from a suspect during an arrest. The court ultimately concluded that nothing in the personnel files was relevant to the case, stating: "If something were remotely relevant, it is certainly of such trivial significance as to be outweighed by the privilege, the confidentiality attaching to those personnel records."

Trial courts are granted wide discretion when ruling on motions to discover police officer personnel records. (*People v. Memro* (1995) 11 Cal.4th 786, 832 [47 Cal.Rptr.2d 219, 905 P.2d 1305].) Here, defense counsel did not allege that Officers Jordan or Padillo fabricated charges against defendant, committed violence against him, or obtained evidence against him by false arrest or by illegal search and seizure. Our independent in

camera review of the sealed personnel files-including the "James M. incident," referred to ante, page 825-reveals no materials so clearly pertinent to the issues raised by the *Pitchess* discovery motion that failure to disclose them was an abuse of *Pitchess* discretion. Accordingly, we conclude the trial court properly exercised its discretion in excluding from disclosure the personnel files of Officers Jordan and Padillo.

Defendant additionally complains the trial court improperly restricted his cross-examination of Officers Jordan and Padillo at trial regarding past incidents of misconduct.

On February 23, 1988, in the course of hearings on pretrial motions, the prosecution filed a motion *in limine* seeking to limit cross-examination (for impeachment purposes) of the police officers concerning past incidents of misconduct in unrelated cases. Defense counsel indicated his intention to file a written response to the motion. On March 7, 1988, the trial court made a "*provisional* ruling" for the guidance of counsel during jury voir dire, directing counsel not to mention "the prior unrelated disciplinary proceedings affecting the two officers," remarking that the evidence "may very well not be allowable."

Because no ruling was actually made below, "no review can be conducted here." (*People v. Rowland* (1992) 4 Cal.4th 238, 259 [14 Cal.Rptr.2d 377, 841 P.2d 897]; *People v. McPeters* (1992) 2 Cal.4th 1148, 1179 [9 Cal.Rptr.2d 834, 832 P.2d 146] ["the absence of an adverse ruling precludes any appellate challenge"].)

<u>Samayoa</u>, 15 Cal. 4th at 824-27.

### B. Merits

#### 1. Pitchess claim

Under California's <u>Pitchess</u> procedure, a defendant has a right to discovery of police officer personnel records, specifically of complaints made against the officer. <u>See</u> <u>Pitchess v. Superior Court</u>, 11 Cal.3d 531 (1974). The <u>Pitchess</u> procedure has been codified. <u>See</u> Cal. Penal Code § 832.7, 832.8; Cal. Evid. Code §§ 1043-1045. To avail himself of these records, a defendant must first make a request, including a description of the records sought and supported by affidavits showing good cause for the request. <u>See</u> Cal. Evid. Code § 1043. If such a showing is made, the trial court will conduct an in camera review of the records to determine their relevance to the current proceedings. <u>See</u> Cal. Evid. Code § 1045.

In the instant case, after detailing the numerous motions filed and hearings held at the trial court level regarding Petitioner's attempts to gain access to the personnel files, the California Supreme Court held the trial court did not abuse its discretion in denying the <u>Pitchess</u> motion because their own review of the sealed documents "reveals no materials so clearly pertinent to the issues raised by the <u>Pitchess</u> discovery motion that failure to disclose them was

1    an abuse of Pitchess discretion." Samayoa, 15 Cal. 4th at 827.

2        Petitioner presently claims that the trial court and state supreme court erred in refusing

3    to allow defense counsel access to these files, contending that "the faulty investigative

4    'techniques' referred to at the hearing in trial court could well have entailed the illegal extracting

5    of statements from defendants, the planting of evidence, the coercion of witnesses, or any other

6    act or combination of acts that had the tendency to discredit their credibility before this jury.

7    The problem with Jordan's 'attitude' could have ranged from having unshined shoes to a gross

8    disregard for due process of law." (Traverse at 53.)  Petitioner further avers that "this request

9    [to review the personnel files] was not a wild goose chase.  It was made in response to facts

10   conceded by the state.  Unless this Court orders that these personnel files be made available to

11   petitioner, no one will ever know if there was additional evidence that could have been employed

12   to reveal to the jury that these key witnesses were unreliable and not worthy of belief." (Id. at

13   53-54.)

14       Petitioner has made no showing, and the Court finds no ground upon which to conclude

15   that the state court fact-finding process was in any way defective. See 28 U.S.C. 2254(d)(2); see

16   also Lockyer v. Andrade, 538 U.S. 63, 75 (2003).  Therefore, absent clear and convincing

17   evidence to the contrary, the California Supreme Court's determination of the facts is presumed

18   correct. See 28 U.S.C. § 2254(e)(1) ("[A] determination of a factual issue made by a State court

19   shall be presumed to be correct."); see also Parke v. Raley, 506 U.S. 20, 35-36 (1992); Williams

20   v. Rhoades, 354 F.3d 1101, 1106 (9th Cir. 2004).  In the instant claim, Petitioner offers mere

21   speculation as to the content of the personnel files and conclusory allegations that the denial of

22   counsel's Pitchess motion amounts to a deprivation of his constitutional rights.   Taylor v.

23   Maddox, 366 F.3d 992, 1010 (9th Cir. 2004).  Petitioner's allegations, without concrete support,

24   are insufficient to rebut the determinations made by the state court.

25       Both the trial court and the state supreme court examined the files in question, and found

26   nothing of relevance aside from one citizen complaint (that of Mr. Legg), which was promptly

27   disclosed to the defense at trial.  The Court defers to the in camera reviews performed by both

28   of these courts, and finds that Petitioner has failed to establish that the files contained any

1   favorable evidence which was not disclosed.  The Court notes that Petitioner's argument is

2   predicated on his assertion that the failure to grant the discovery motion violated his rights under

3   the Sixth Amendment's Confrontation Clause.  However, the Supreme Court has explained that

4   the denial of discovery requests should be reviewed under the Due Process rather than the

5   Confrontation Clause.  See Pennsylvania v. Ritchie, 480 U.S. 39, 51-56 (1987).  Moreover,

6   Petitioner has failed to present any argument or citation to authority that supports his allegation

7   of an Eighth Amendment violation due to the denial of his discovery motion, and the Court

8   rejects this aspect of his claim for relief.

9          Ultimately, Petitioner fails to show the state supreme court's adjudication of this claim

10   was contrary to, or an unreasonable application of, clearly established federal law or that it was

11   based on an unreasonable determination of the facts.  Williams, 529 U.S. at 412-13.  Petitioner

12   is not entitled to habeas relief on this portion of claim 5.

13

14                 2.    Trial Court's Restriction on Cross-Examination

15          Petitioner also alleges the trial court improperly refused to allow the defense to cross-

16   examine Detectives Jordan and Padillo at trial with past instances of misconduct.  Respondent

17   asserts this portion of the claim is barred under state procedural grounds but maintains "[t]here

18   is no need for this Court to decide whether Samayoa should be excused from his procedural

19   default because, default aside, Samayoa is unable to make the showing that he would be entitled

20   to relief if he could prove the truth of the allegations in his Amended Petition." (Opposition to

21   Motion for Evidentiary Hearing ["Opp. Mot. EH"] at 28.)

22          During a preliminary discussion on the scope of voir dire, the trial court and counsel

23   engaged in a discussion on the allowable areas of inquiry in response to a defense motion (No. 1)

24   for discovery and a prosecution motion (No. 10) to limit the cross-examination of Detectives

25   Jordan and Padillo.  The trial court held as follows:

26          As to the in limine motion pretrial No. 10, the provisional ruling will be that no
          one should mention the prior unrelated disciplinary proceedings affecting the two
27          officers.  This is some of the subject matter No. 10 that was also involved in No.
          1, the discovery motion, and all counsel are ordered not to touch on any possibility
28          of that kind of impeachment.  It may very well not be allowable.

-62-                                    00cv2118

1   (RT 1051-52.)

2       Defense counsel at trial did not raise the issue again. Appellate counsel brought the claim

3   on direct appeal and the California Supreme Court declined to reach the merits, stating that

4   because the trial court's provisional ruling was never made final, "no review can be conducted

5   here." Samayoa, 15 Cal. 4th at 827.

6       The Ninth Circuit has instructed that when it is evident that a state court has not

7   reached the merits of a petitioner's claim, either because it was not raised in state court or

8   because the state court denied it on procedural grounds, the AEDPA deferential standard does

9   not apply, and to the extent a federal habeas court can reach the merits, it must review the claim

10  de novo. See Pirtle v. Morgan, 313 F.3d 1160 (9th Cir. 2002); see also Killian v. Poole, 282 F.3d

11  1204, 1208 (9th Cir. 2002) ("For claims on which no adjudication on the merits was possible,

12  however, AEDPA's standard of review does not apply.") Because Respondent has waived the

13  procedural default argument, the Court will conduct a de novo review of this claim.

14      Although the opportunity of cross-examination is fundamental to a defendant's

15  constitutional rights under the Confrontation Clause, the right is not limitless. While the United

16  States Supreme Court has held that a trial court may not prevent the defendant from cross-

17  examining a prosecution witness, a trial court may place reasonable limits on cross-examination

18  based on the need for fairness and order in the proceedings. Delaware v. VanArsdall, 475 U.S.

19  673, 679 (1986). Federal courts are generally reluctant to impose constitutional restraints on

20  evidentiary rulings made by state trial courts, for instance noting that "[t]he Confrontation

21  Clause guarantees an opportunity for effective cross-examination, not cross-examination that

22  is effective in whatever way, and to whatever extent, the defense might wish." Id. (quoting

23  Deleware v. Fenester, 474 U.S. 15, 20 (1985)).

24      In this case, Petitioner contends that the trial court erred by refusing to allow defense

25  counsel to explore certain avenues of impeachment in their cross-examinations of Detectives

26  Jordan and Padillo. However, even if the trial court erred in this regard, habeas relief is

27  warranted only if the error is not found to be harmless. An error is not harmless if it is proven

28  to have had a "substantial and injurious effect or influence in determining the jury's verdict."

-63-                                                00cv2118

1   Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).  In determining whether an alleged error is

2   harmless, the reviewing court must examine "what effect the error had or reasonably may be

3   taken to have had upon the jury's decision."  Wade v. Calderon, 29 F.3d 1312, 1322 (9th Cir.

4   1994), overruled on other grounds by Rohan ex rel Gates v. Woodford, 334 F.3d 803, 815 (9th

5   Cir. 2003).  The Supreme Court has further clarified that "[t]he inquiry ... is not whether, in a

6   trial that occurred without the error, a guilty verdict would have been rendered, but whether the

7   guilty verdict actually rendered in *this* trial was surely unattributable to the error."  Sullivan v.

8   Louisiana, 508 U.S. 275, 279 (1993) (emphasis in original).

9          Detective Patrick Padillo testified on guilt phase cross-examination that Detective Jordan

10   informed Petitioner during the first interview, which went unrecorded, that the police possessed

11   hair evidence they said linked Petitioner to the crime, but it was only after Jordan posed the

12   question, "She was a fighter, wasn't she?" that Petitioner started to make a statement to the

13   police. (RT 3516-17.) Padillo further testified that their second interview, which was recorded,

14   was actually more of a give and take conversation. (RT 3517.) Padillo admitted that the police

15   did not have any physical evidence linking Petitioner to the crime and that Detective Jordan had

16   "confronted Petitioner with a bluff" on the hair evidence during their first interview.  (Id.)

17   Padillo further admitted that Petitioner was posed numerous questions about whether he

18   intended to kill the victims, and he answered "no" to each one. (RT 3518.) Padillo testified that

19   Petitioner told police he hit the victim Nelia Silva "to get away" and "accidentally hit the baby"

20   when Mrs. Silva grabbed him. (RT 3518-23.) Padillo also acknowledged that during the first

21   interview Petitioner said he felt bad about everything. (RT 3524.)

22          Detective Padillo was not cross examined using any of the contested areas of

23   impeachment, and Detective Jordan only testified at trial on an ancillary matter, and was also

24   not cross-examined on past incidents or his conduct in interviewing suspects.  However,

25   Detective Padillo, who testified as to the contents and conduct of the interrogations of

26   Petitioner, was cross-examined about their failure to tape the first interview and the deceptive

27   techniques used to elicit a statement from Petitioner.

28          The Ninth Circuit has used a two-part inquiry to determine whether a defendant's Sixth

-64-

1    Amendment rights were violated by the exclusion of evidence. Wood v. Alaska, 957 F.2d 1544,

2    1549-50 (9th Cir. 1992). First, the Court determines whether the evidence was relevant. Id. at

3    1550.  If the evidence is relevant, the Court must determine whether "legitimate interests

4    outweighed [the defendant's] interest in presenting the evidence." Id. As stated above, any

5    error found does not entitle Petitioner to relief unless he can establish that such error "has

6    substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S.

7    at 637.

8         The Court finds the airline coupon incident mentioned at trial and in the direct appeal

9    opinion was not relevant to the credibility of the detectives and the trial court did not abuse its

10   discretion in disallowing cross-examination on that subject. With regard to the Legg complaint,

11   such a complaint by a witness in an unrelated homicide investigation was likely relevant to an

12   inquiry into the credibility of the detectives. However, the Court finds that there were legitimate

13   reasons for excluding that area of inquiry, such as the possibility of confusing the jury.  In

14   addition, the trial court's decision to disallow mention of the Legg complaint and airline coupon

15   incident did not keep Petitioner from effectively cross-examining Detective Padillo at trial.  The

16   evidence in question would not have made an appreciable difference in the jury's assessment of

17   the detective's credibility. See Van Arsdall, 475 U.S. at 680.

18        Moreover, Petitioner made three inculpatory statements to law enforcement, two of them

19   to Detectives Jordan and Padillo and another to Dr. Griswold, a police psychiatrist, all of which

20   were introduced as evidence at trial. Additionally, Petitioner's own family members testified for

21   the state that Petitioner had given them jewelry and other valuables later found to have

22   belonged to the victims, with Petitioner's own brother testifying that a wrench found in the

23   victims' yard, which was consistent with the instrument which inflicted the injuries suffered by

24   the Silvas, looked like one that was missing from his back shed.  The trial court's error, if any,

25   in granting the prosecution's request to limit the cross-examination of the detectives, did not

26   render Petitioner's trial fundamentally unfair, nor did it have a substantial and injurious effect

27   on the verdict. See Brecht, 507 U.S. at 637.  Accordingly, Petitioner is not entitled to relief on

28   this claim.

-65-

D.    Evidentiary Hearing

Petitioner states "it would appear that there were other incidents in the personnel records of these two men that the state courts believed were not relevant. As these records may well implicate a federal constitutional issue, it is respectfully urged that the Court review said records to ascertain the correctness of the state court's judgment under the above cited federal law." (Pet. at 111.) Respondent maintains that Petitioner "is unable to make a showing of fact because he does not know what additional impeachment, if any, might have been in the personnel records of the detectives. To that extent, the instant motion for an evidentiary hearing is nothing more than a fishing expedition more than 20 years after the matter should have properly been presented in state court." (Opp. Mot. EH at 29.)

In Pennsylvania v. Ritchie, the Supreme Court held that a defendant's right to a fair trial and the government's interest in protecting confidential information were secured by submitting the records in question to the trial court for an in camera review. In so holding, the Supreme Court specifically noted that an "advocate's eye," that is, review of the documents by defendant's attorney rather than in camera by the court, was not necessary to ensure a defendant's right to a fair trial. Ritchie, 480 U.S. at 60. Significantly, the Court also noted "[d]efense counsel has no constitutional right to conduct his own search of the State's files to argue relevance." Id. at 59.

The Ninth Circuit has espoused the notion that "[h]abeas corpus is not a general form of relief for those who seek to explore their case in search of its existence." Aubut v. Maine, 431 F.2d 688, 689 (1st Cir. 1970) (adopted by Calderon v. United States District Court (Nicolaus), 96 F.3d 1102, 1106 (9th Cir. 1996)). In the instant claim, Petitioner has failed to demonstrate a concrete, colorable basis for his allegations of constitutional error and Petitioner's unsupported speculation about potential contents of the personnel files are not a sufficient basis for an evidentiary hearing. Williams v. Calderon, 52 F.3d 1465, 1484 (9th Cir. 1995); see also Baja, 187 F.3d at 1078. Petitioner's assertion that the police officers' personnel files *may* have contained additional impeachment material that *may* have been beneficial on cross-examination is certainly not a sufficient basis to require an in camera inspection of those files by the Court.

-66-

00cv2118

1  The claim does not warrant an evidentiary hearing.

2  **6.    Claim 6 - Illegal Seizure Resulting in Confession**

3      In claim 6, Petitioner contends he was not brought before a magistrate for arraignment

4  within a reasonable time after his arrest, and his confession was a fruit of his illegal detainment,

5  violating his rights against illegal seizure. (Pet. at 111-14.)  Petitioner also contends that trial

6  counsel's failure to challenge the confession on the above grounds constituted ineffective

7  assistance of counsel. (Id. at 114.)

8      A.    State Court Proceedings

9      Petitioner raised this claim in the second state habeas petition, and the California

10  Supreme Court denied this claim as follows:

11      Claim II: The Fourth Amendment aspect of this claim is forfeited by petitioner's failure
        to raise it in the trial court (In re Seaton (2004) 34 Cal.4th 193, 200), and is, in any
12      event, not cognizable on habeas corpus. (In re Harris (1993) 5 Cal.4th 813, 830.) The
        Sixth Amendment aspect of the claim is denied on the merits. In addition, the entire
13      claim is also barred as untimely and successive (In re Robbins (1998) Cal.4th 770, 780-
        781 [untimeliness]; 788 fn. 9 [successiveness]; In re Clark (1993) 5 Cal.4th 750, 767-768
14      [successiveness].)

15  (Doc. No. 69; Lodgment No. 1.)

16      B.    Procedural Bar

17      As discussed above in Section III, supra, the Court will review this claim on the merits

18  irrespective of the state court's application of procedural bars.

19      C.    Merits

20      Petitioner was arrested on a parole violation on Wednesday, January 29, 1986.  (RT 98.)

21  Detectives Jordan and Padillo interrogated Petitioner regarding his involvement in the murders

22  on Friday, January 31, 1986; Petitioner was arrested on the murder charges later that same day.

23  (CT 443, 446.)  On Sunday, February 2, 1986, Petitioner was again questioned regarding the

24  murders and made incriminating statements to the police detectives. (Ex. D-3 to Pet.)  On

25  Monday, February 3, 1986, Petitioner was questioned by police psychiatrist Dr. Griswold and

26  again made incriminating statements.  (Ex. D-9 to Pet.)  On Tuesday, February 4, 1986,

27  Petitioner was arraigned on the murder charges and defense counsel was assigned.  (Supp. RT

28  Vol 1.)

-67-

1    The United States Supreme Court has held that the Constitution requires a reasonably

2    prompt determination of probable cause following the warrantless arrest of a criminal defendant,

3    and that a delay in the arraignment that is longer than 48 hours is presumptively unreasonable.

4    See County of Riverside v. McLaughlin, 500 U.S. 44, 55-58 (1991).  However, the Supreme

5    Court has expressly declined to rule on the appropriate remedy for a violation of this rule.  See

6    Powell v. Nevada, 511 U.S. 79, 84 (1994).

7                    1.      Fourth Amendment

8    California Penal Code § 1548.5 provided Petitioner with ample opportunity to present his

9    claim in state court and, in any event, pursuant to the Supreme Court's decision in Stone v.

10   Powell, 428 U.S. 465 (1976), Petitioner's claim is foreclosed on federal habeas review. Ortiz-

11   Sandoval v. Gomez, 81 F.3d 891, 899 (9th Cir. 1996); Gordon v. Duran, 895 F.2d 610, 613-614

12   (9th Cir. 1990).  The Supreme Court has stated, "[i]n sum, we conclude that where the State

13   has provided for full and fair litigation of a Fourth Amendment claim, a state prisoner may not

14   be granted federal habeas corpus relief on the ground that evidence obtained in an unreasonable

15   search or seizure was introduced at his trial." Stone, 428 U.S. at 494.  Therefore, the Fourth

16   Amendment aspect of Petitioner's claim is not cognizable on federal habeas.

17                   2.      Fifth and Sixth Amendment

18   Petitioner argues "although the claim has some Fourth Amendment underpinning, the

19   essential nature of the claim lies in the Fifth and Sixth Amendment guarantees of due process

20   of law, fair trial and right to counsel.  Using a Fourth Amendment analysis, respondent [sic]

21   maintained that the delay in arraignment was irrelevant because petitioner was in custody for

22   a parole violation, therefore, the 48 hour rule did not apply and there  was no Fourth

23   Amendment violation under McLaughlin and Gerstein.  However, there are other fundamental

24   constitutional underpinnings for the requirement of speedy arraignment than simply a review of

25   probable cause for the crimes charged and the fact that a parole hold was in effect does not

26   ameliorate these constitutional imperatives." (Reply to Opp. Mot. SJ at 25.)

27   Petitioner adds that counsels' "[f]ailure to challenge the statement on these [Fourth

28   Amendment] grounds could not have been a tactical decision by trial counsel as they challenged

-68-                                           00cv2118

1 the statements on Fifth Amendment grounds.  Not to pursue this valid ground for suppression

2 of this statement is ineffective assistance of counsel." (Pet. at 114.)

3      In <u>Kimmelman v. Morrison</u>, 477 U.S. 365 (1986), the Supreme Court adapted the

4 <u>Strickland</u> test to a situation where a Fourth Amendment claim is central to the claim of

5 ineffective assistance of counsel.  The Ninth Circuit correctly articulated the test applied when

6 the ineffective assistance of counsel claim is "rooted in defense counsel's failure to litigate a

7 Fourth Amendment issue" and stated that a petitioner "must show that (1) the overlooked

8 motion to suppress would have been meritorious and (2) there is a reasonable probability that

9 the jury would have reached a different verdict absent the introduction of the unlawful

10 evidence." <u>Ortiz-Sandoval v. Clarke</u>, 323 F.3d 1165, 1170 (9th Cir. 2003).

11      Even if the Court were to find that such a motion would have been meritorious, Petitioner

12 fails to demonstrate resultant prejudice, which is necessary to succeed on the merits.  The

13 Supreme Court has never dictated that a statement obtained in violation of <u>McLaughlin</u> should

14 be suppressed, and Petitioner made two other inculpatory statements to law enforcement

15 personnel prior to the expiration of the 48 hour period.  Petitioner has failed to show a

16 reasonable probability that the exclusion of the third statement, given to a police psychiatrist

17 three days after his arrest on the murder charges, would have affected the jury's verdict.

18 <u>Kimmelman</u>, 477 U.S. at 375; <u>Ortiz-Sandoval</u>, 323 F.3d at 1170.  Counsel's alleged error does

19 not undermine the Court's confidence in the outcome of Petitioner's trial.

20      Petitioner has failed to show that the state court's adjudication of this claim was contrary

21 to, or an unreasonable application of, clearly established federal law. <u>Williams</u>, 429 U.S. at 412-

22 13.  Therefore, Petitioner is not entitled to habeas relief on this claim.

23      D.    <u>Evidentiary Hearing</u>

24      As stated above, the Supreme Court has maintained that "[i]f district courts were

25 required to allow federal habeas applicants to develop even the most insubstantial factual

26 allegations in evidentiary hearings, district courts would be forced to reopen factual disputes that

27 were conclusively resolved in the state courts." <u>Landrigan</u>, 550 U.S. 465, 127 S. Ct. at 1940.

28 Petitioner has not provided the Court with any proffer of anticipated testimony, facts he would

1  hope to prove if the Court were to grant an evidentiary hearing, or even identify any facts that

2  are in dispute that might be resolved during a hearing.  Moreover, in his motion for summary

3  judgment, Petitioner concedes that for claim 6 "there are no material issues of genuine fact that

4  must be decided by this Court."  (Pet. MSJ at 32.)

5        Therefore, the Court finds no basis for holding an evidentiary hearing on this claim, and

6  Petitioner's motion is denied.

7  **7.    Claim 7 - Right to Testify at Trial**

8        Petitioner alleges trial counsel refused to allow him to testify, violating his rights to due

9  process, compulsory process, and right against self-incrimination.  (Pet. at 115-16.)

10       A.     California Supreme Court's Decision

11       Petitioner presented this claim to the state court in the second state habeas petition.  The

12  California Supreme Court denied this claim (claim III in that petition), stating:

13       Claims III, IV, and V are denied on the merits.  In addition, each of these claims is also
         barred as untimely and successive.  (*See Robbins*, *supra*; *Clark*, *supra*.).

14

15  (Doc. No. 69; Lodgment No. 1.)

16       B.     Procedural Bar

17       As discussed above in Section III, <u>supra</u>, the Court will review this claim on the merits

18  irrespective of the state court's application of procedural bars.

19       C.     Merits

20       The United States Supreme Court has stated that: " The right to testify on one's own

21  behalf at a criminal trial ... is one of the rights that 'are essential to due process of law in a fair

22  adversary process.'" <u>Rock v. Arkansas</u>, 483 U.S. 44, 52-53 (1987) (quoting <u>Faretta v. California</u>,

23  422 U.S. 806, 819 n. 15 (1975)).  The right "stems from several provisions of the Constitution,

24  including the Fourteenth Amendment's Due Process clause, the Sixth Amendment's compulsory

25  Due Process clause, and the Fifth Amendment's privilege against self-incrimination." <u>United</u>

26  <u>States v. Pino-Noriega</u>, 189 F.3d 1089, 1094 (9th Cir. 1999).

27       The Ninth Circuit and the California courts have taken similar views, reasoning that a

28  criminal defendant must voice his intention at the appropriate time or will be held to have

-70-                                        00cv2118

1  waived this right.  A waiver of the right to testify may be deduced from a defendant's conduct

2  and presumed from his failure to testify or notify the court of his desire to testify.  See United

3  States v. Joelson, 7 F.3d 174, 177 (9th Cir. 1993); People v. Cox, 53 Cal. 3d 618, 671 (1991).

4  A defendant waives his right to testify if he remains silent in the face of his attorney's decision

5  not to call him as a witness.  See id.; Horton v. Mayle, 408 F.3d 570, 577 (9th Cir. 2005); Dows

6  v. Woods, 211 F.3d 480, 487 (9th Cir. 2000).

7       In a declaration attached to the federal petition, Petitioner avers trial counsel prevented

8  him from testifying at his trial, claiming, "I did not know I had a right to testify if my attorneys

9  told me I could not testify."  (Ex. A-9 to Pet. at 2.)  Petitioner claims that he was actually a

10  lookout for a man named Armando Medina during the crimes, and five minutes after Medina

11  entered the house, victim Nelia Silva came home.  Petitioner additionally claims that fifteen to

12  twenty minutes after Mrs. Silva's arrival home, Medina exited the home and gave Petitioner

13  some jewelry to hold.  (Id. at 1.)  Petitioner asserts he confessed to detectives because he wanted

14  to return to prison, and thought he would only be charged with the crime of burglary.  (Id.)

15       Petitioner maintains he told this information to his attorneys, that they did not believe

16  him, and that he "was told by his counsel he could not testify."  (Id. at 2.)  Petitioner contends

17  that these allegations are supported by trial counsels' log.  An examination of trial counsels' logs

18  reveal the following relevant entries:

19  1)  April 10, 1986- Counsel writes that he "[i]nterviewed defendant...Defendant still
20      maintains his story re: 2nd guy. I explained to him that 2nd guy story will be
        extremely hard to sell. Defendant basically agreed."  (Ex. D-1 to Pet. at 1.)

21  2)  April 21, 1987- Counsel writes that he "[d]iscussed defendant's testimony re:
22      confession. Practiced a little in Q & A. Defendant got a little emotional when we
        talked about dad & son & wife. Motive to give false confession discussed with
23      defendant." (Id. at 15.)

24  3)  April 24, 1988- Counsel mentions a meeting with defendant regarding the penalty
        phase, and notes "[d]efendant acting up...Sure defendant would fall apart on cross
25      since he wants death. Decision made not to put defendant on stand in penalty
        phase . . ." (Id. at 31.)
26

27  4)  April 25, 1988- Counsel meets with defendant the next day, writing
        "[i]nterviewed defendant...defendant is real volatile. He keeps saying he wants
28      death. I am convinced now more than ever he'd blow whole case if he testifies."
        (Id. at 32.)

-71-

1    An examination of counsel's guilt phase logs demonstrate to the Court that Petitioner and

2  trial counsel discussed the potential of raising a defense regarding a second individual at the

3  scene, and "basically agreed" that such a defense would be unlikely to persuade a jury.

4  Additionally, counsel's penalty phase logs show that Petitioner was "volatile" and wanted a death

5  verdict, and therefore counsel were admittedly reluctant to have him testify at the penalty phase.

6  The logs do not support Petitioner's allegations, and his belated assertion that counsel actively

7  prevented him from testifying lacks any factual support.

8    Moreover, at no time during his trial did Petitioner ever inform the court that he wanted

9  to testify.  During a conference outside the presence of the jury, defense counsel stated that it

10  was still "questionable" whether Petitioner would testify.  (RT 3018.)  Later, trial counsel rested

11  the defense presentation during the guilt phase without calling Petitioner to testify, yet Petitioner

12  remained silent.  (RT 4176.)  Again, when defense counsel rested on guilt phase sur-rebuttal

13  without calling Petitioner to the stand, he did not voice any desire to testify.  Petitioner's "silence

14  at trial effectively waived his right to testify on his own behalf."  See United States v. Edwards,

15  897 F.2d 445, 446-47 (9th Cir. 1990);  see also United States v. Nohara, 3 F.3d 1239, 1243-44

16  (9th Cir. 1993).  Petitioner was an experienced criminal defendant and could have challenged

17  a tactical decision by counsel by either insisting on testifying, speaking to the trial court, or

18  discharging his attorneys.  See United States v. Martinez, 883 F.2d 750, 761 (9th Cir. 1989),

19  vacated on other grounds, 928 F.2d 1470 (9th Cir. 1991).

20    Petitioner also contends he "did not have the mental wherewithal to challenge his counsel

21  before the Court," and cites to several exhibits purporting to demonstrate his impaired mental

22  capabilities.  (Pet. at 116; Mot. for EH at 24.)  As discussed in greater detail in the Court's

23  resolution of his incompetency claim (see claim 10, infra.), Petitioner has failed to demonstrate

24  that he did not possess the mental abilities to stand trial or was in any way unable to engage in

25  meaningful discussion with trial counsel regarding the prospect of testifying at trial.  See Godinez

26  v. Moran, 509 U.S. 389, 396 (1993).

27  ///

28

1    Petitioner has failed to demonstrate that the state supreme court's adjudication of this

2    claim was contrary to, or an unreasonable application of, clearly established federal law.

3    <u>Williams</u>, 429 U.S. at 412-13.  Petitioner is not entitled to habeas relief on this claim.

4          D.    <u>Evidentiary Hearing</u>

5          At no point during the proceedings did Petitioner voice his intention to testify, and never

6    informed the trial court that he disagreed with his attorney's decision to rest the defense case

7    without calling Petitioner as a witness.  <u>See</u> <u>Horton</u>, 408 F.3d at 577.  As stated above,

8    Petitioner waived his right to testify by remaining silent on the issue during the trial proceedings.

9    <u>Edwards</u>, 897 F.2d at 446-47;  <u>Nohara</u>, 3 F.3d at 1243-44.  The Ninth Circuit has held that "an

10    evidentiary hearing is not required on issues that can be resolved by reference to the state court

11    record."  <u>Totten v. Merkle</u>, 137 F.3d 1172, 1176 (9th Cir. 1998) (emphasis omitted).  Petitioner

12    is not entitled to habeas relief on this claim, and an evidentiary hearing would not alter that

13    finding.

14    **8.**    **<u>Claim 8 - Ineffective Assistance of Counsel for Failure to Investigate Forensic</u>**

15          **<u>Evidence</u>**

16          Petitioner claims trial counsel's failure to pursue the investigation of forensic evidence

17    pointing to another suspect violated his rights to the effective assistance of counsel.  (Pet. at 117-

18    19.)

19          A.    <u>State Supreme Court</u>

20          In his first habeas petition presented to the California Supreme Court, Petitioner alleged

21    in claim VI part F that trial counsel had been ineffective for failing to investigate evidence

22    pointing to another suspect.  Petitioner claimed that, prior to trial, he had told counsel that the

23    actual killer was Armando Medina.  The California Supreme Court denied the claim "on the

24    merits."  (Doc. No. 69; Lodgment No. 4.)

25          In his second state habeas petition, Petitioner argued in claim IV that trial counsel had

26    been ineffective for failing to investigate evidence that pointed to another suspect.  In this claim,

27    Petitioner asserted that counsel failed to investigate forensic evidence, blood at the crime scene

28    that matched neither the victims or petitioner, pointing to the possibility that another individual

1  was involved in the crime.  The California Supreme Court denied the claim as follows:

2      Claims III, IV, and V are denied on the merits.  In addition, each of these claims is also
3      barred as untimely and successive.  (*See Robbins, supra; Clark, supra.*).

4  (Doc. No. 69; Lodgment No. 1.)

5      B.    Procedural Bars

6      As previously discussed, procedural default is an affirmative defense which must be pled

7  and proven by the government.  See Bennett, 322 F.3d at 586 ("because it is the State who seeks

8  dismissal based on the procedural bar, it is the State who must bear the burden of demonstrating

9  that the bar is applicable...")  To properly raise procedural default, the state must sufficiently

10 plead "the existence of an independent and adequate state procedural ground as an affirmative

11 defense."  Id.

12     In the arguments on this claim, Respondent maintains that the state supreme court

13 "disagreed with Petitioner's arguments and denied the claim on its merits on March 16, 2005.

14 (Lodgment 1 (Claim VI).)"  (Ans. at 77.)  Respondent later elaborates on this argument,

15 maintaining the state court "denied this claim on its merits for failing to make a prima facie

16 showing."  (Opp. to Mot. EH at 34.)

17     Respondent's allegation is erroneous in several respects.  First, the instant claim was raised

18 as claim IV in the second state petition, not as claim VI.  Additionally, the claim was not simply

19 denied on the merits- the state court also imposed procedural bars.

20     Respondent has not properly raised the affirmative defense of an adequate and

21 independent procedural bar regarding this claim, and has thus waived its application.  The Court

22 will not evaluate any potential application of procedural bars to claim 8.

23     C.    Merits of the Claim

24     Petitioner alleges that trial counsel failed to investigate forensic evidence that indicated

25 that blood of a type other than Petitioner or either victim was present at the crime scene.  In

26 light of his contention that another individual was involved in the crime (see claim 7, supra),

27 Petitioner alleges counsel rendered ineffective assistance of counsel in failing to pursue this

28 avenue of investigation and present this evidence at trial.  Petitioner alleges that during pre-trial

1   discovery, defense counsel received information that blood of a type other than his or the victims

2   was found at the scene of the crime, in the form of bench notes made by state criminologist

3   Walter Fung, who testified as a prosecution witness. (Ex. D-11 to Pet. at 1.)  Petitioner alleges

4   these notes "reflected the presence of blood at the scene of the crime, in close proximity to the

5   bodies, that was of a different type than that of the victims or petitioner." (Pet. at 117.)

6          To prevail on a claim of ineffective assistance of counsel, Petitioner must show that: (1)

7   his trial attorneys' performance fell below an objective standard of reasonableness and (2) that

8   he suffered prejudice as a result of counsels' deficient performance. Strickland, 466 U.S. at 688.

9   The Court's scrutiny of an ineffective assistance of counsel claim is highly deferential, with a

10  strong presumption that counsel's conduct falls within the wide range of reasonably professional

11  conduct. Id. at 689.  Trial counsel has a "duty to make reasonable investigations or to make a

12  reasonable decision that makes particular investigations unnecessary." Id. at 691.

13         Serologist and criminalist Walter K.W. Fung first testified that Nelia Silva, Katherine

14  Silva, and Petitioner all had type A blood. (RT 3462-63.)  Fung testified that his main concern

15  was attempting to distinguish between the blood stains of each victim, stating, "I had no reason

16  to believe that the defendant bled or would have left a substantial enough blood at the scene to

17  be able to find." (RT 3468.)  However, Fung testified that he was unsuccessful in conclusively

18  identifying the source of each blood stain at the scene as both victims had the same proteins.

19  (RT 3467.)  Fung testified that he found human blood on the wrench, which was also type A.

20  (RT 3469-70.)  Fung added that on many items he only performed a chemical presumptive test

21  for human blood, and did not determine the blood type of those stains.  (RT 3475-76, 3478.)

22  Fung also stated that he tested Petitioner's clothing and did not find any blood. (RT 3478-80.)

23  On cross-examination, Fung agreed there was no blood evidence linking Petitioner to the scene

24  of the crime.  (RT 3480.)

25         The notes Petitioner refers to can be described as follows: several columns are on the left

26  listing the numbers of each exhibit (17 are listed) that was tested for blood evidence, and several

27  columns under the headings "A," "B," and "O," each with various markings. The "A" column

28  contains at least 28 "+" signs and 6 "-" signs, the "B" column contains only one "+" sign and

34 "-" signs, and the "O" column contains four "+" and 30 "-" signs.  Several "+" markings also contain either a number 1 or 2 next to them in subscript form.  Petitioner concludes that Fung's notes show the presence of an assailant that could not be petitioner, and habeas counsel appends a declaration stating that the notes "should have put any attorney practicing in the mid-1980's on notice that there might be an issue as to the identity of the actual killer, as the blood found at the scene may be from a person other than petitioner and the victims."  (Ex. B to Traverse at 1-2.)

With the filing of the traverse to the federal petition, Petitioner attempts to buttress his claim with a declaration by serologist and criminalist Mark Scott Taylor, who states in relevant part:

> 7.   I have reviewed reports and handwritten notes of criminalists related to the examination and serological testing performed on items of evidence in the case of Samayoa v. Woodford, 00CV2118.
>
> 8.   Specifically, there are a series of handwritten notes (Bates 394-422) that describe this examination and testing.
>
> 9.   Bates 418 lists the results of apparent absorption elution ABO blood typing of a series of evidence items.
>
> 10.   Based on these notes, all of the items tested gave either no activity or indications of type A activity, except for item 57-1A.  This stain shows apparent A and B activity.  A and B activity would indicate that at least some of the blood in this stain is from an individual who is either ABO type AB or type B.
>
> 11.   Based on the notes, this stain appeared to be blood and was presumptively positive for blood using ortho-tolidine reagents.  There is also an indication that this stain contained biological materials of human origin.
>
> 12.   All known reference samples tested in association with this case (Nelia Silva, Katherine Silva, and Richard Samaya [sic]) are ABO type A, therefore the results on item 57-1A represent an individual other than those typed in association with this case.
>
> 13.   An additional concern is that A, B, and O standards noted at the top of Bates 418 do not list any ABO typing results.

(Ex. A to Traverse at 1-2.)

Petitioner also appended a letter attached to the declaration as an exhibit to his Traverse, which stated the results of post-conviction DNA examination and testing performed in the case

1  by Technical Associates.[5]  The lab conducted testing on various pieces of wallpaper with blood

2  spatter, fingernail scrapings, and blood flakes, and concluded that the samples in question either

3  (1) "originated from a female individual" and either victim could not be excluded as the donor

4  of the sample, or (2) the tests were inconclusive due to "insufficient DNA to give conclusive

5  results." (Ex. C to Traverse.)  The lab also concluded that "male DNA was not detected in any

6  of the samples tested." (Id.)

7       The Court will consider whether the letter and declaration render the claim

8  unexhausted.[6]  To satisfy the exhaustion requirement in this case, Petitioner must have

9  presented the California Supreme Court with a fair opportunity to rule on the merits of the

10  claim, that is, he must have presented the same factual basis and legal theory in state court for

11  the claim that he presents in federal court.  See Granberry v. Greer, 481 U.S. 129, 133-34

12  (1987); Gray v. Netherland, 518 U.S. 152, 163 (1996).  The federal petition may not be

13  supported by facts that put the claim in a "significantly different and stronger evidentiary

14  posture" than the claim previously addressed by the state court.  Aiken v. Spaulding, 841 F.2d

15  881, 883 (9th Cir. 1988).  Petitioner's inclusion of the Taylor letter and declaration did not

16  deprive the state court of a fair opportunity to rule on the merits of this claim, and does not place

17  the claim in a different or stronger evidentiary posture.  The Court will consider these documents

18  in its evaluation of the merits of this claim.

19       The Ninth Circuit has held that "[a] lawyer who fails adequately to investigate, and to

20  introduce into evidence, [evidence] that demonstrate[s] his client's factual innocence, or that

21  raise[s] sufficient doubts as to that question to undermine confidence in the verdict, renders

22

23  [5] Petitioner also includes two reports on lab testing performed on hairs found at the scene or on
   the bodies of the victims', of which several hairs were found to be microscopically dissimilar to victim
   Nelia Silva, her husband, and Petitioner. (Motion for EH at 26.)  However, Katherine Silva's hair was
24  not collected from the scene. (RT 539-40.)  Additionally, the other report on these hairs state only that
   "[t]he hairs recovered from the [panties/pink top] were inconsistent with the hair standards of Nelia
25  Silva and Richard Samayoa," making no mention of Rolando Silva.  (Ex. B to Traverse at 3.)  Mere
   speculation on the possible origins of these hairs lends no support to Petitioner's claim.
26

27  [6] Respondent asserts that "[a]s neither the letter nor the declaration by Mark Scott Taylor were
   ever presented to the California Supreme Court, they should not be considered by this Court. 28 U.S.C.
28  § 2254(d)(1)."  Respondent's citation refers to the "contrary to" or "unreasonable application" prong of
   AEDPA, and the Court does not see any relation between this statute and Respondent's contention.

-77-                                                            00cv2118

1   deficient performance." Avila v. Galaza, 297 F.3d 911, 919 (9th Cir. 2002) (quoting Hart v.

2   Gomez, 174 F.3d 1067, 1070 (9th Cir. 1999)).  Specifically, the Ninth Circuit has ruled on

3   multiple occasions that a failure to investigate circumstantial evidence that someone other than

4   defendant committed the murder of which defendant was convicted constitutes ineffective

5   assistance of counsel at trial. Jones v. Wood, 207 F.3d 557 (9th Cir. 2000); Sanders v. Ratelle,

6   21 F.3d 1446 (9th Cir. 1994); see also Baylor v. Estelle, 94 F.3d 1321 (9th Cir. 1996) (counsel's

7   failure to develop and follow up on DNA evidence suggesting that the defendant was not the

8   actual assailant in a rape case was considered ineffective assistance of counsel).

9       The Court's examination of the record shows that some investigative follow up was

10  performed regarding Petitioner's contention that there was a second individual, Armando

11  Medina, at the scene.  Records attached to the state exhaustion petition demonstrate that the

12  defense investigator at trial ran a county, state, and federal criminal record check on that name,

13  with negative results. (Doc. No. 69; Lodgment No. 9, Ex. 42.)  The investigator's report states

14  that, through information provided by a confidential informant, "it appears that Crazy Boy

15  Armando Medina does exist and is in Mexico."  (Id.)  Counsel's trial logs contain notes made

16  regarding Petitioner's claim of a second individual at the scene of the crime, where counsel

17  writes, "[i]nterviewed defendant...Defendant still maintains his story re: 2nd guy. I explained to

18  him that 2nd guy story will be extremely hard to sell. Defendant basically agreed." (Ex. D-1 to

19  Mot. SJ at 1.)  Considering the contents of the investigative records and trial counsel's logs, it

20  is evident that trial counsel considered and ultimately decided against introducing evidence

21  regarding Mr. Medina at trial.  Instead, counsel pursued a defense that consisted of working to

22  negate the intent allegations at the guilt phase and hopefully avoid a penalty phase, in an

23  attempt to save Petitioner's life.  Petitioner has failed to demonstrate that further investigation

24  into the blood drops at the scene of the crime would have altered the defense strategy, and has

25  failed to overcome the presumption that counsels' decision not to pursue this defense was a

26  reasonable, tactical decision. See Strickland, 466 U.S. at 689.

27      The Ninth Circuit has held that "ineffective assistance claims ... must be considered in

28  light of the strength of the government's case." Eggleston v. United States, 798 F.2d 374, 376

1   (9th Cir. 1986).  Accordingly, in light of the knowledge that Petitioner had made detailed

2   inculpatory statements to law enforcement authorities on three separate occasions, counsel's

3   strategy cannot be deemed unreasonable.  In addition, the defense was also faced with evidence

4   from Petitioner's own family members, many of whom had received jewelry items belonging to

5   the victim from Petitioner, which they turned over to the police, plus the fact that the wrench

6   used in the murders was identified by Petitioner's brother as similar to one that was missing from

7   the work shed behind the family home.  Moreover, even had counsel introduced this evidence

8   at trial, the Court finds no prejudice, concluding there was no reasonable probability that the

9   jury's verdict would have been different.  Strickland, 466 U.S. at 694.  Counsel's alleged error

10  does not undermine confidence in the outcome of Petitioner's trial.

11          The Court cannot conclude that the state supreme court's adjudication of this claim was

12  contrary to, or an unreasonable application of controlling federal law, nor that it was based on

13  an unreasonable determination of the facts.  See Williams, 429 U.S. at 412-13.  Accordingly,

14  Petitioner does not merit habeas relief on this claim.

15          D.      Evidentiary Hearing

16          Petitioner asserts that he "has raised a colorable claim that trial counsel provided

17  constitutionally ineffective assistance of counsel in failing to investigate" the information listed

18  above and avers that an "evidentiary hearing with full discovery process and additional funding

19  from this Court is necessary to resolve this factual issue."  (Mot. EH at 27.)  The Court has held

20  that counsel's actions were not prejudicially ineffective, and the California Supreme Court's

21  resolution of this claim on appeal was reasonable and consistent with federal law.  Petitioner has

22  failed to "allege specific facts which, if true, would entitle him to relief."  Ortiz, 149 F.3d at 934.

23  Therefore, Petitioner does not merit an evidentiary hearing on this claim.

24  **9.      Claim 9 - Coercion in Obtaining Petitioner's Confession to Dr. Griswold**

25          Claim 9 alleges that the police used psychological coercion on Petitioner in order to

26  obtain his February 3, 1986 statement to Dr. Griswold, in violation of his rights to a fair trial, due

27  process, and a reliable penalty determination under the Fifth, Sixth, Eighth, and Fourteenth

28  Amendments.  (Pet. at 119-23.)  Petitioner includes a sub-claim that trial counsel was ineffective

-79-                                        00cv2118

1  in failing to present this claim to the trial court. (Id. at 123.)

2       A.    State Court Decision

3       The California Supreme Court considered and rejected this claim on direct appeal, as

4  follows:

5      Defendant contends the trial court erred in denying his motions to suppress his three
6      confessions on the grounds that (1) at the initial interrogation, after being advised of his
    Miranda rights, defendant invoked his privilege against self-incrimination when he
7      refused the officers' request to tape-record the interview, and (2) defendant's waiver of
    Miranda rights was not knowing or voluntary, because of the circumstance-in
8      conjunction with his refusal to be tape-recorded-that he was not advised specifically that
    his statements could be used against him "in court." For these reasons, argues defendant,
9      his initial confession was obtained in violation of Miranda, his second and third
    confessions were the tainted product of his initial confession, and the failure to suppress
10     all three confessions requires reversal of his conviction and sentence of death.

11      The state court went on to recount the procedural background surrounding Petitioner's

12 attempts to suppress the confessions at trial and on state appeal, and engaged in an analysis of

13 Petitioner's contention that the police interrogation resulted in the involuntary waiver of his

14 Miranda rights, concluding as follows:

15     On the basis of the trial court's findings, which are substantially supported by the record,
16     we conclude the trial court reasonably determined that defendant's explicit waiver of his
    Miranda rights was knowing and voluntary, and not the result of a misconception that
17     his statements were off the record. Accordingly, the trial court did not err in denying
    defendant's motions to suppress his confessions on the ground of a Miranda violation.

18
    Because we conclude that defendant's initial confession was not obtained in violation of
19     Miranda, we also reject defendant's related claims that his second and third confessions-in
    which he repeated his statements after full Miranda waivers-were the tainted product of
20     his initial confession. In any event, we observe that admissions made pursuant to full
    Miranda waivers may not be suppressed because of prior Miranda violations unless the
21     later admissions were in fact involuntary. (Oregon v. Elstad (1985) 470 U.S. 298 [105
    S.Ct. 1285, 84 L.Ed.2d 222].) The record discloses no basis on which to conclude that
22     defendant's Miranda waivers at the second and third interviews were other than
    knowingly and voluntarily given, and thus valid. Accordingly, admission of the first
23     interview, even if erroneous under Miranda, was harmless beyond a reasonable doubt.
    (See Arizona v. Fulminante (1991) 499 U.S. 279, 306-309 [111 S.Ct. 1246, 1262-1265,
24     113 L.Ed.2d 302]; People v. Sims, supra, 5 Cal.4th at p. 447.)

25 Samayoa, 15 Cal. 4th at 828-31.

26      Petitioner again raised the claim in his first state habeas petition, as Claim III, and the

27 California Supreme Court found:

28     To the extent the claim reasserts issues raised and rejected on appeal, it is denied on the

merits and under *Waltreus, supra.* 62 Cal.2d 218, 225. To the extent this claim rests upon additional information outside the record on appeal, it is denied on the merits. To the extent this claim is based upon the subterfuge employed by Detective Jordan, it could have and should have been raised on appeal, and hence is denied on the merits and under *In re Dixon* (1953) 41 Cal.2d 756, 759.

(Doc. No. 69; Lodgment No. 4.)

Petitioner then raised a related claim as Claim V of his second state habeas petition, asserting the police had coerced Petitioner to speak with Dr. Griswold, and his third confession should have been suppressed. Petitioner also included a sub-claim that trial counsel had been ineffective in failing to present this claim to the trial court. The California Supreme Court ruled as follows:

> Claims III, IV, and V are denied on the merits. In addition, each of these claims is also barred as untimely and successive. (*See Robbins, supra; Clark, supra.*). Furthermore, regarding Claim V; To the extent the claim reasserts issues raised and rejected on appeal, it is barred under *In re Waltreus* (1965) 62 Cal.2d 218, 225; to the extent the claim reasserts issues considered and rejected in connection with the initial habeas corpus petition that this court acted upon on September 27, 2000, the claim is barred under *In re Miller* (1941) 17 Cal.2d 734, 735, and to the extent this claim is based upon the transcripts of the second and third interviews/confessions, it could and should have been raised on appeal, and hence is barred under *In re Dixon* (1953) 41 Cal.2d 756, 759.

(Doc. No. 69; Lodgment No. 1.)

    B.    Procedural Bars

As discussed above in Section III, <u>supra</u>, the Court will review this claim on the merits irrespective of the state court's application of procedural bars.

    C.    Merits

Involuntary confessions are inadmissible in criminal cases pursuant to the Fourteenth Amendment. <u>Blackburn v. Alabama</u>, 361 U.S. 199, 207 (1960). The voluntariness of a confession or admission is evaluated by reviewing both: (1) the conduct of the police in extracting the statements and (2) the effect of that conduct on the suspect. <u>Miller v. Fenton</u>, 474 U.S. 104, 116 91985); <u>Henry v. Kernan</u>, 197 F.3d 1021, 1026 (9th Cir. 1999). The United States Supreme Court has held that, absent police misconduct proven to be causally related to a defendant's confession, there is no basis to conclude a confession was involuntary. <u>Colorado v. Connelly</u>, 479 U.S. 157, 167 (1986).

To determine the voluntariness of a confession, the court must consider the effect that

-81-

00cv2118

1   the totality of the circumstances had upon the will of t he defendant.   Schneckloth v.
2   Bustamonte, 412 U.S. 218, 226-27 (1973). The reviewing court must determine whether, under
3   the totality of the circumstances, "the government obtained the statement by physical or
4   psychological coercion or by improper inducement so that the suspect's will was overborne."
5   United States v. Leon Guerrero, 847 F.2d 1363, 1366 (9th Cir. 1988); see also Derrick v.
6   Peterson, 924 F.2d 813, 818 (9th Cir. 1991). Moreover, the voluntariness of a confession is not
7   a factual issue entitled to a presumption of correctness under 28 U.S.C. § 2254(d), but it is a
8   legal question which merits independent consideration in a federal habeas proceeding. Miller,
9   474 U.S. at 110. While the reviewing court must undertake a de novo review of the state court's
10  legal finding that a confession was voluntarily given, factual conclusions reached by the state
11  court are entitled to a presumption of correctness. Derrick, 924 F.2d at 818; Rupe v. Wood, 93
12  F.3d 1434, 1444 (9th Cir. 1996).

13          The Court's review of the record demonstrates that the police conduct was not
14  sufficiently coercive such that Petitioner's will was overcome, and thus the confessions were
15  voluntary. The police had already interviewed Petitioner twice, obtaining inculpatory statements
16  on both occasions, when Petitioner was offered a third interview with a police psychiatrist.
17  Petitioner acquiesced to this interview, even though he had been informed that the police
18  psychiatrist was not going to actually treat him.   On February 3, 1986, Petitioner made a
19  statement to Dr. Griswold, the police psychiatrist.  Despite Petitioner's protestation that the
20  police enticed Petitioner to consent to this interview through psychological coercion, the Court
21  sees no police misconduct that is causally related to Petitioner's statements to Dr. Griswold.
22  Because Petitioner fails to show any basis for concluding that his will was overborne, his alleged
23  need or desire for psychological assistance does not have any bearing on the totality of the
24  circumstances, as personal characteristics of the defendant are not relevant to a voluntariness
25  determination absent proof of coercion. See Derrick, 924 F.2d at 818; see also Connelly,  479
26  U.S. at 165 ("[w]hile mental condition is surely relevant to an individual's susceptibility to police
27  coercion, mere examination of the confessant's state of mind can never conclude the due process
28  inquiry.")

1    Petitioner also asserts that trial counsel's failure to raise a motion to suppress the

2    statements to Dr. Griswold constituted prejudicially ineffective assistance of counsel in violation

3    of Strickland.  However, the Court's examination of the record shows that trial counsel did file

4    numerous motions with the trial court in an attempt to suppress the confessions, and the moving

5    papers included specific argument on the voluntariness issue.  Of particular note is one section

6    of a motion filed by trial counsel in an effort to suppress Petitioner's statements to Dr. Griswold,

7    which was entitled: "Involuntary Confessions or Admissions Must Be Suppressed," and in the

8    briefing trial counsel argued "[t]he officers also implied that a confession or statement would help

9    defendant, and *that if he told the truth they would get him psychiatric help*."  (CT 585-86) (emphasis

10    added).  Counsel pursued this claim in the trial court, and this Court cannot conclude that trial

11    counsel's performance was constitutionally deficient.  See Strickland, 466 U.S. at 690.

12    The California Supreme Court's rejection of this claim on appeal was not contrary to, nor

13    an unreasonable application of, clearly established federal law.  Williams, 429 U.S. at 412-13.

14    Petitioner does not merit habeas relief on this claim.

15    D.    Evidentiary Hearing

16    Petitioner asserts that an evidentiary hearing is necessary and warranted on his claim of

17    coercion in order "to ascertain the full role of Dr. Griswold in obtaining the confession, the

18    motivations and complete actions of Jordan and Padillo, the nature of any pre-statement

19    conversations between the officers and petitioner and all circumstances surrounding the

20    statement in question." (Mot. EH at 31.)  Respondent maintains the claim does not warrant an

21    evidentiary hearing and that Petitioner "fails to explain what witnesses would be called, what

22    evidence would be garnered, or exactly what facts he would attempt to prove if an evidentiary

23    hearing was granted."  (Opp. Mot. EH at 39.)

24    As the claim can be resolved by the examination of the record, Petitioner's claim of

25    coercion leading to an involuntary statement does not warrant an evidentiary hearing.  Baja, 187

26    F.3d at 1078; see also Totten, 137 F.3d at 1176.  The Court finds the determinations made by

27    the California Supreme Court in resolving this claim are reasonable, and Petitioner fails to allege

28    any new facts that could be established during an evidentiary hearing that would serve to

1   undermine the state supreme court's determination that Petitioner's statements were voluntary.

2   **10.    Claim 10 - Incompetence to Stand Trial**

3   Claim 10 alleges Petitioner was convicted and sentenced to death while he was mentally

4   incompetent to stand trial, in violation of his rights under the Fifth, Sixth, Eighth and

5   Fourteenth Amendments.  (Pet. at 124-26.)  Petitioner also contends that trial counsel was

6   ineffective for failing to properly raise the claim, including a failure to adequately investigate

7   Petitioner's background and hire proper experts to diagnose him.  (Id. at 126.)  Respondent

8   maintains the state supreme court's denial of the claim is entitled to deference, and asserts that

9   Petitioner has failed to demonstrate he was not at fault in failing to develop the claim in state

10  court and does not meet any statutory exceptions that would allow him to proffer additional

11  evidence to the Court.  (Ans. at 84.)

12  A.    State Court Decision

13  Petitioner raised this claim as claim II of his first state habeas petition, relying upon the

14  evidence of brain damage and impairments that had been alleged at trial, and the California

15  Supreme Court ruled as follows:

16  Claim II is denied on the merits.

17  (Doc. No. 69; Lodgment No. 4.)

18  Petitioner again raised the claim as claim VI of his second state habeas petition, relying

19  upon new expert reports by Dr. Bruce Hubbard and Dr. Gretchen White.  The California

20  Supreme Court denied the claim as follows:

21  Claim VI is denied on the merits.  In addition, except insofar as it rests upon the
    information contained in Exhibits J and K, this claim is barred as untimely and successive

22  (see *Robbins, supra; Clark, supra*).

23  (Doc. No. 69; Lodgment No. 1.)

24  B.    Procedural Bars

25  As discussed above in Section III, <u>supra</u>, the Court will review this claim on the merits

26  irrespective of the state court's application of procedural bars.

27  C.    Merits

28  The conviction of a legally incompetent defendant violates the constitutionally

-84-                                        00cv2118

1   guaranteed right to due process of law. <u>Cooper v. Oklahoma</u>, 517 U.S. 348, 354 (1996);

2   <u>Cacoperdo v. Demosthenes</u>, 37 F.3d 504, 510 (9th Cir. 1994). The Supreme Court has held the

3   test for competency is "whether defendant has sufficient present ability to consult with his lawyer

4   with a reasonable degree of rational understanding and has a rational as well as factual

5   understanding of the proceedings against him." <u>Godinez</u>, 509 U.S. at 396 (quoting <u>Dunsky v.</u>

6   <u>United States</u>, 362 U.S. 402 (1960)); <u>Hernandez v. Ylst</u>, 930 F.2d 714, 716 n.2 (9th Cir. 1991).

7   Whether a defendant is capable of understanding the proceedings and assisting trial counsel

8   depends on factors including "evidence of the defendant's irrational behavior, his demeanor in

9   court, and any prior medical opinions on his competence to stand trial." <u>Drope v. Missouri</u>, 420

10   U.S. 162, 180 (1975); <u>see also</u> <u>United States v. Lewis</u>, 991 F.2d 524, 527 (9th Cir. 1993).

11   Moreover, the burden of establishing mental incompetence rests with the petitioner. <u>Boag v.</u>

12   <u>Raines</u>, 769 F.2d 1341, 1343 (9th Cir. 1985).

13        The evidence in the record does not demonstrate Petitioner was incompetent to stand

14   trial. There is no evidence of any outbursts on the part of Petitioner or unconventional behavior

15   in or out of court, nor is there any indication that either of Petitioner's defense attorneys were

16   of the opinion that Petitioner was not competent to stand trial. <u>See</u> <u>Medina v. California</u>, 505

17   U.S. 437, 450 (1992) ("defense counsel will often have the best-informed view of the defendant's

18   ability to participate in his defense"); <u>see also</u> <u>United States v. Clark</u>, 617 F.2d 180, 186 (9th Cir.

19   1980). Moreover, the Court finds no evidence that any other individual present at the trial ever

20   suggested that Petitioner was not able to comprehend the proceedings. <u>See</u> <u>Hernandez v. Ylst</u>,

21   930 F.2d at 718 ("[w]e deem significant the fact that the trial judge, government counsel, and

22   Hernandez's own attorney did not perceive a reasonable cause to believe Hernandez was

23   incompetent.")

24        Additionally, Petitioner was interviewed by two police psychiatrists and several defense

25   experts, and his records were reviewed by several other expert medical and psychological

26   witnesses prior to trial. Not one of these individuals indicated that they believed Petitioner was

27   unable to understand the proceedings against him or was unable to constructively consult with

28   his attorneys. <u>See</u> <u>Godinez</u>, 509 U.S. at 402. In fact, the primary evidence that Petitioner

1  presents in support of this claim is a report from Dr. Bruce Hubbard, dated January 8, 2002,

2  which states in relevant part:

3       In my opinion, Mr. Samayoa was competent to stand trial, understanding the
        nature of the process and the roles of the individuals involved.  However, it is also
4       my opinion that he was not competent to cooperate with his attorney in
        structuring his own defense.  Mr. Samayoa's concept of the truth is best described
5       as based on shifting sands, a shift to provide support for his perceived short-term
        survival.  Mr. Samayoa appears so habitual at this that it is not clear to this
6       examiner if he even knows that he is lying.  This lack of knowledge or appreciation
        of one's self-lying is not unusual in individuals who employ this habitually as a
7       defense.

8  (Ex. C-2 to Pet.)

9       The Court also notes that Dr. Hubbard's opinion, rendered more than fifteen years after

10 the trial, was not even based on an in-person examination of Petitioner, but on a review of prior

11 medical, psychological tests, and other records relating to Petitioner.  The Court certainly will

12 not accord this belated assessment greater weight than the perceptions of the trial court, counsel

13 and the medical professionals that came into contact with Petitioner at the time of trial, none

14 of whom raised any concerns about Petitioner's competency.  The Ninth Circuit has held that

15 retroactive determinations of incompetency are disfavored and considerable weight is to be given

16 to any lack of contemporaneous evidence of a petitioner's incompetence to stand trial.  See

17 Williams v. Woodford, 384 F.3d 567, 608 (9th Cir. 2004).  Under these facts and law, Petitioner

18 has failed to demonstrate that he was incompetent to stand trial.

19      Petitioner further alleges that his trial counsel were prejudicially ineffective for failing to

20 raise this issue at trial.  (Mot. EH at 33.)  Petitioner has provided declarations from both trial

21 counsel in support of other claims in this petition, yet neither defense attorney makes any claim

22 that he believed Petitioner may have been incompetent, failed to understand the proceedings,

23 or was unable to assist counsel in preparing a defense at trial.  Furthermore, Petitioner has not

24 provided the Court with specific examples or evidence to support his claim that trial counsel

25 should have undertaken an investigation into Petitioner's competence to stand trial.

26      In order to establish a claim of ineffective assistance o f counsel, petitioner must

27 demonstrate he suffered actual prejudice as a result of counsel's alleged deficient performance.

28 Strickland, 466 U.S. at 689.  A reviewing court must "examine the reasonableness of counsel's

1   conduct 'as of the time of counsel's conduct.'" United States v. Chambers, 918 F.2d 1455, 1461

2   (9th Cir. 1990) (quoting Strickland, 466 U.S. at 690.)  The record before the Court does not

3   support Petitioner's claim that he was unable to understand the proceedings against him or assist

4   counsel in preparing a defense.  In the absence of any evidence arising from Petitioner's actions

5   at the time of trial, and the lack of any indication from counsel, the court, or other individuals

6   privy to the trial proceedings that Petitioner was not competent, the Court finds counsel was not

7   ineffective in failing to raise this issue at trial.

8         Petitioner has failed to show the state court's rejection of this claim on appeal was

9   contrary to, or an unreasonable application of, clearly established federal law, or that it was based

10   on an unreasonable determination of the facts.  Williams, 529 U.S. at 412-13.  Petitioner is not

11   entitled to habeas relief on this claim.

12        D.    Evidentiary Hearing

13         A petitioner is entitled to an evidentiary hearing if he is able to establish a colorable claim

14   for relief, did not fail to develop the facts surrounding his claim, and was never given a state

15   hearing on the claim.  Insyxiengmay, 403 F.3d at 670 (quoting Baja, 187 F.3d at 1078).  To

16   establish a colorable claim, Petitioner is "required to allege specific facts which, if true, would

17   entitle him to relief." Ortiz, 149 F.3d at 934.  To be entitled to an evidentiary hearing on a claim

18   of incompetence to stand trial, the Ninth Circuit has specifically held that a petitioner must raise

19   a "real and substantial" doubt as to his competency, even if the facts presented to the habeas

20   court were not presented to the trial court.  Boag, 769 F.2d at 1343.  Petitioner has not

21   established a colorable claim for relief, nor has he raised any real or substantial doubt as to his

22   competency to stand trial, and thus does not merit an evidentiary hearing on this claim.

23

24                 **VII. CONCLUSION**

25         For the reasons discussed above, Petitioner's Motion for Summary Judgment on Claims

26   I and VI is **DENIED**.  Petitioner's Motion for an Evidentiary Hearing on Claims I, IV, V, VI,

27   VII, VIII, IX, and X is **DENIED**.  The Amended Consolidated Petition for Writ of Habeas

28   Corpus is **DENIED** as to all claims.

00cv2118

1     The Court issues a Certificate of Appealability ["COA"] on Claim 1 and declines to issue

2   a COA on Claims 2-10.  See 28 U.S.C. 2253(c); Slack v. McDaniel, 529 U.S. 473, 484 (2000)

3   (a COA should be granted when a petitioner has made a "substantial showing of the denial of

4   a constitutional right," that is, when reasonable jurists could debate (or agree that) the petition

5   should have been resolved in a different manner *or that "the issues presented were adequate to*

6   *deserve encouragement to proceed further"*) (emphasis added).

7     The Clerk of Court is **ORDERED** to enter Judgment for Respondent and to close Case

8   No. 00-cv-2118.

9

10    **IT IS SO ORDERED.**

11

12   DATED:   January 8, 2009

13                                      HON. THOMAS J. WHELAN
                                        United States District Court
14                                      Southern District of California

15

16

17

18

19

20

21

22

23

24

25

26

27

28